570 S.E.2d 160

Shawn Paul HUMPHRIES, Petitioner,

v.

STATE of South Carolina, Respondent.

No. 25519.

Supreme Court of South Carolina.

Submitted June 26, 2002.
Decided Aug. 26, 2002.
Rehearing Denied Oct. 10, 2002.

Deputy Chief Attorney Joseph L. Savitz, III, of South Carolina Office of Appellate Defense, of Columbia, for petitioner.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia, for respondent.

## ON WRIT OF CERTIORARI

### CHIEF JUSTICE TOAL:

Shawn Paul Humphries ("Petitioner") appeals from the denial of his application for post-conviction relief ("PCR").

### FACTUAL/PROCEDURAL BACKGROUND

Petitioner was tried for the murder of Dickie Smith ("Smith"), the owner of a Max–Saver convenience store. Petitioner was convicted of murder, attempted armed robbery, and criminal conspiracy. He was sentenced to death for murder and to concurrent sentences of twenty years for attempted armed robbery and five years for criminal conspiracy. His convictions and sentences were affirmed on direct appeal. *State v. Humphries*, 325 S.C. 28, 479 S.E.2d 52 (1996), *cert. denied*, 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997).

The evidence at trial, including the video from the store's surveillance camera, established that Petitioner and an accomplice entered the convenience store with the intention of robbing the store. Smith, who was working in the store, asked Petitioner whether he wanted anything. Petitioner flashed the gun he had stolen the night before and replied he wanted money. There was some evidence to suggest Smith then reached under the counter to get a gun. When Smith reached under the counter, Petitioner fired a shot in Smith's direction and fled from the store.[1] The bullet fired by Petitioner struck Smith in the head, killing him. Petitioner was apprehended and immediately confessed his crime.[2]

---

**1.** When the shot was fired, Petitioner's accomplice, Eddie Blackwell, fainted and later regained consciousness prior to the arrival of the police. Blackwell was convicted of murder, criminal conspiracy, and attempted armed robbery, and received a life sentence for murder.

**2.** When the arresting officer asked Petitioner where the gun was, Petitioner immediately told him it was in his belt. Petitioner remained cooperative throughout the arrest.

The jury convicted Petitioner of murder, and after hearing all the evidence in the sentencing phase, recommended a death sentence. The statutory aggravating factor relied on by the State, and found by the jury, was that the murder was carried out while in the commission of an armed robbery.[3]

During the sentencing phase, the State introduced testimony from the victim's family (his brother and his wife) about Smith's childhood, work ethic, generosity, and close relationship with his young daughter. Smith's brother testified he and his brother grew up in a poor family and that they did not have hot water. When Smith was nine years old, his father died. After his father's death, Smith and other family members began working to support the family. Smith's brother testified when Smith was in the ninth grade, he took a job as a meat cutter at Bi–Lo after school, working until 10:00 or 11:00 at night. In the tenth grade, Smith acquired a full-time job working second shift in a textile mill while continuing to attend school. Smith's brother testified further that everyone in the community liked Smith and that he was a good person.

Smith's wife also testified during the sentencing phase. She described Smith as ambitious, hardworking, and generous. For instance, after receiving one technical degree and becoming a supervisor, Smith went back to school to get his residential home builder's license and began building houses in 1986. According to Smith's wife, she and Smith had a daughter, Ashley, in 1988. Smith's wife described Smith and Ashley's relationship as very close, and testified Ashley was having a hard time since her father was killed and was receiving counseling.

Petitioner presented evidence in mitigation during the sentencing phase through the testimony of thirteen witnesses. Apparently, Petitioner's strategy was to mitigate the circumstances of his offense by making the jury aware of the brutal circumstances in which he was raised.

Petitioner's paternal grandfather testified Petitioner and Petitioner's brother lived with him and Petitioner's grandmother from the time Petitioner was three years old until Petitioner was twelve years old. Petitioner's grandfather

---

3. The facts are as stated in this Court's opinion in *State v. Humphries.*

testified that he and his wife were heavy drinkers, and that his wife grew marijuana in their back yard. Petitioner's grandfather described his son, Petitioner's father, as unpredictably violent, noting he had been to prison several times. Petitioner's grandfather testified that his son, Petitioner's father, had cut him on the arm with a knife and had kicked Petitioner's grandmother in the face, knocking her false teeth out.

Next, Petitioner's aunt testified Petitioner's father had said on numerous occasions that he never loved his children and that the children should have been aborted.

Petitioner's mother testified that, after she left Petitioner's father, she became pregnant with Petitioner as a result of his father raping her at knife point. She stated she eventually left the children with their paternal grandparents and married several more men. She reunited with the children only after she married someone who would allow the children to live with her.

Petitioner's mother also discussed Petitioner's criminal record. According to his own mother's testimony, Petitioner was arrested in 1984 for two counts of breaking and entering, and was placed on probation. Thereafter, he was given more probation after he was suspended from school for fighting several times. After Petitioner's second probation revocation when he was fifteen years old, he was sent to Reception & Evaluation in Columbia for thirty days and was placed on probation again. Petitioner was arrested in January 1989 for breaking into a church, apparently looking for food because he had been living on the street for a week. Petitioner pled guilty to that charge and was placed on probation. In 1990, Petitioner was charged with stealing an automobile after he was released from substance abuse treatment in Texas.[4] As a result of that charge, Petitioner was sentenced to two years imprisonment with four years of probation.

Petitioner's step-mother testified that Petitioner's father used a combination of alcohol, drugs, and paint fumes every day, and had shared those substances with Petitioner from 1983 to 1992.

---

4. Petitioner's mother enrolled him in substance abuse treatment because she had observed him huffing paint, and, upon visiting his residence, had discovered empty paint cans and rags littering the floor.

Petitioner's brother testified regarding the circumstances in which he and Petitioner grew up, including: their father's violence toward his own parents, the lack of hot water and sometimes running water, the lack of food, and the trips taken to the dumpsters to find school clothes.

Mary Shults, an expert witness with a degree in sociology and a master's degree in social work, testified regarding Petitioner's social history. She related that Petitioner had been reminded throughout his life that he was a product of rape. Shults stated that Petitioner's father was incredibly violent, would kick people in the face, cut people, and would refer to himself as Satan. In addition, Shults testified that Petitioner's father introduced Petitioner to drugs and alcohol sometime between the ages of six and ten.

At the close of the sentencing phase evidence, Petitioner's counsel moved to prohibit the solicitor from making any reference to victim impact in his closing argument. The trial judge denied that motion.[5]

In his sentencing phase closing remarks, the solicitor argued, in part:[6]

It's easy in this stage of the game—in this stage of the trial to start looking at [Petitioner] as a victim in this case. And the Defense wants to paint a picture sort of a window for you to look through. Let's remember the good [Petitioner], and lets forget what he did and let's forget all the back record and all that stuff. Let's just look at what he did.

And they presented a bajillion [sic] pictures of [Petitioner] as a little boy to you. Folks, the State of South Carolina is

---

5. In denying the motion, the trial judge stated:

I realize that this is an issue that's in this case that if the death penalty is returned, that the appellate courts will have to address. How the Supreme Court wants to deal with my ruling as to whether it is or is not evidence of aggravation or is it just merely pointing out the characteristics of the victim in this case, or is it adequately covered in the notice, I'll let them worry about it. I've ruled, and the water's over the bridge, so I will not prohibit from arguing to the jury those facts, since that is now in the record.

6. We have italicized the portions of the solicitor's closing argument that Petitioner underlined in his brief, however, we have included more of the solicitor's comments than Petitioner included in his brief.

not attempting to send to death row that little boy in that picture. Every defendant in this country who has gone to death row has had pictures like that. Everyone that comes after this will have pictures like that.

We're not talking about a three year old boy or a six year old boy or a twelve year old boy. We're talking about a 22 year old man who went to a store and executed [Smith]. That's what we're talking about. But it's easy at this stage when you go through day after day of testimony about [Petitioner] to start looking at him as some sort of victim.

I would submit to you that the last thing you need to look at in this case is [Smith] and his uniqueness as an individual. When I talk about [Smith], I'm not trying to get tears of sympathy for him. A jury's duty is to look objectively at the case. So look at the cold hard facts.

. . .

[Smith] was born in 1950, fourth son, fifth child of a fellow named Alton Smith and a sweet lady named Lottie Mae Darnell Smith. They grew up poor. They didn't have hot water. They had a spigot coming in and a tub next to the stove, and they had a few acres of cotton.

*[Smith] is as much about this case as [Petitioner].* When [Smith's father] died when [Smith] was nine, he pulled himself up by his boot straps and he started contributing to the family. He got all kinds of odd jobs picking cotton at a penny a pound, hunting rabbits, skinning them, dressing them out, selling them for 50 cents.

When he's 14 years old, he gets a job in Greenville at the Bi–Lo in the Meat Department working after school. He's gone to school all day. From after school till about 10:00 or 10:30 at night working at Bi–Lo, saving his money, buying a car for the family.

When he's in tenth grade, he goes down to Boenett's and he gets a full-time job, second shift. He's going to school all day, and he's working until midnight, contributing. Lottie Mae Darnell Smith with eight kids, got them all out of high school, all at least a tech degree, some of them through college.

When [Smith] finished high school, he went to work for Union Carbide, then Kemet, but he didn't stop there. He

kept improving himself. He went to Tech, he got an engineering degree, and he became a supervisor, and then he went back to Tech because he decided he wanted to build houses, and he got his—another degree at Tech, and he got his builder's license.

*And in 1984 he met Pat and they fell in love, and they got married. That's the same year [Petitioner] committed two house break-ins at age 13.1986, [Smith] makes a pretty drastic move. He decides he's going to quit Kemet and go build houses full-time, and he goes out, and he starts building houses in the community he had grown up in. That's the same year [Petitioner] is up for his second probation violation and sent down to Columbia.*

Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old ... stepsister, said, "Please don't put Shawn Paul Humphries in the electric chair." I'm sorry I did not feel it was appropriate to bring in a six year old [sic] girl Ashley and parade her in front of you.

*In 1988 Ashley is born. That's the same year [Petitioner] went to jail for two years.* And in the spring of 1992, I believe, [Smith] opens the doors to the Max–Saver, building a business down in that community.

You have the right to look at the uniqueness of the individual. I would submit to you that [Smith], by everybody's description to you was a unique individual. He grew up in that southern part of Greenville County below Simpsonville that was mainly farming, cotton, agriculture area.

And he grew up watching it change to industrial. And he first went to work at Union Carbide, and then decides he was going to be part of that change, and he started building houses down there.

Who is the victim? Is it [Petitioner] or is this lady right here, his momma, or his wife, or Ashley, who the only way she can see her daddy is to go visit his grave on Sunday after church?

There are a lot of reasons for punishment. Rehabilitation is one reason, and rehabilitation is a proper goal in some circumstances, but you've got to decide about whether [Peti-

tioner], who at 13 is breaking the law, at 14 is breaking the law, at 17 is going—is breaking the law, at 18 is breaking the law and going to jail, who's been given every chance that the system offers. You decide if you're going to rehabilitate him.

What are some reasons for punishment? Retribution is one reason for punishment. That may not sound good, may not sound right, but, in fact, it is part of punishment, because retribution is our community saying you have done something wrong and we're going to punish you.

We don't allow individual retribution. If something happened to your momma, your sister, we don't allow you to go out and individually take retribution against the perpetrator, but it's the community saying you have broken a law in the community, and we're going to punish you.

And the question is when somebody commits the ultimate act, can they be subject to the ultimate punishment? And the answer is yes. And what we do is impanel a jury, and they decide when we're going to invoke the ultimate punishment.

I would submit to you folks that every time a jury sits in a situation like this, something important happens. I'm not talking about duty. I'm not talking about service. I'm talking about values. Every time a jury sits in a case like this, it is a statement of our values as a community, as a society. It's like a banner.

I'm not talking about dollars and cents. The Defense will say, "Well, sending [Petitioner] to the electric chair is not going to bring [Smith] back." I'm not talking about that, and you don't have to answer to anyone for the verdict you bring back, but *I'm talking about value.*

When you look at a case like this, when you look at the aggravation, when you look at the total lack of mitigation, I would submit, *when you look at the character of [Petitioner], and when you look at Smith,* how profane when you look at all the circumstances of this crime and of this [Petitioner], how profane to give this man a gift of life under these circumstances.

Each of you said, "If the case was aggravating enough, if the case was senseless enough, yes, I could sign that form."

What punishment will you recommend here? What punishment do you recommend for a crime as senseless as this?

... *What punishment do you recommend when somebody like [Smith] is taken from us?* ...

...

If not in a case as aggravating as this, if not in a case with absolutely no mitigation like this, *if not in a case with a character like this, if not in a case when somebody like [Smith] is taken, then when are you going to do it?*

The jury deliberated and recommended death. Afterwards, the trial judge stated,

> The only thing that remotely would cause me concern is that issue of the error—the alleged error as to that [victim impact] testimony, but whether or not it's wrong to admit it or not, the jury having heard it, I don't think made a decision on the basis of prejudice, passion or any other arbitrary factor.

At the post-trial motions hearing, Petitioner's counsel objected to the solicitor's use of comparisons between Smith and Petitioner during his argument. The trial judge noted the facts solicitor referenced during the argument were clearly in the record. The trial judge disagreed with counsel's reading of *Payne v. Tennessee,*[7] and commented further that the solicitor's argument was one of the best arguments he had ever heard, particularly in terms of the technique, delivery, and effectiveness.

On direct appeal, Petitioner argued the prosecution's use of the victim impact evidence during closing argument was inappropriate and prejudicial. However, this Court held the argument was not preserved. *State v. Humphries,* 325 S.C. at 35, 479 S.E.2d at 56.

At the PCR hearing on Petitioner's PCR application, S.J. Henry, one of Petitioner's trial counsel, testified the objection made to the comparison argument was not timely. He testified he was aware an objection should have been made at the time of the closing argument and the failure to do so would render the issue not preserved for appeal. Henry testified the failure to object during the solicitor's argument was not done

---

7. 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

as a matter of trial strategy. Henry believed the critical factors resulting in Petitioner's sentence of death were the video tape of the crime and the victim impact testimony of Smith's wife.

Petitioner's other trial attorney, John Mauldin, testified in a deposition which was presented to the PCR court. Mauldin stated the solicitor's closing argument compared Smith's life and Petitioner's life, and that this argument had a devastating effect on Petitioner's ability to receive a life sentence. Mauldin testified, in his "modest and limited understanding of *Payne* . . . that a comparative analysis between the life of the deceased and the life of the defendant is not authorized." He stated he should have made an objection at the time the solicitor made the comparison and used *Payne* as authority for that objection. However, he stated, at the time, he was unsure whether he knew the solicitor's comparison argument was wrong.

The PCR court found Petitioner's contention—that the solicitor had suggested Petitioner should die because his life—was worth less than Smith's life-was not supported. The court found that there was no reference to the comparative worth of Smith and Petitioner. The court further noted the fact Petitioner and Smith had similar backgrounds, which defeated the probative worth of much of the defense's presentation in mitigation, did not cause the argument to be in error. The court concluded, since there was no showing the argument was improper, Petitioner's counsel could not be deemed ineffective for failing to object to the argument. The court further noted that *Payne* actually encourages the prosecution to comment on evidence on record about the life of the victim and about the life of the defendant. Therefore, the PCR court found Petitioner failed to show his attorneys were ineffective.

The Court granted certiorari on the following issue:

Were Petitioner's attorneys ineffective for failing to object to the solicitor's comparison of Smith and Petitioner in his closing argument?

### Law/Analysis

Petitioner argues his attorneys were ineffective for failing to timely object to the solicitor's closing argument, which Peti-

tioner alleges suggested he deserved to die because his life was worth less than his victim's.

In order to prove counsel was ineffective, the applicant must show counsel's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Thrift v. State,* 302 S.C. 535, 397 S.E.2d 523 (1990). This Court will sustain the PCR judge's findings regarding ineffective assistance of counsel if there is any probative evidence to support those findings. *Skeen v. State,* 325 S.C. 210, 481 S.E.2d 129 (1997).

A solicitor's closing argument must not appeal to the personal biases of the jurors nor be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences to it. *State v. Cooper,* 334 S.C. 540, 514 S.E.2d 584 (1999) (citation omitted). A solicitor has a right to state his version of the testimony and to comment on the weight to be given such testimony. *Id.* Improper comments do not automatically require reversal if they are not prejudicial to the defendant, and the appellant has the burden of proving he did not receive a fair trial because of the alleged improper argument. *Simmons v. State,* 331 S.C. 333, 503 S.E.2d 164 (1998) (citations omitted). The relevant question is whether the solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Id.* (citations omitted).

In *Payne v. Tennessee,* the United States Supreme Court reversed its prior precedent regarding the admission of victim impact evidence. In *Payne,* the Supreme Court held,

if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.

Victim impact evidence is admissible in South Carolina, and the State is permitted to make arguments regarding that

evidence during the sentencing phase of a death penalty trial.[8] While the admissibility of victim impact evidence (in the form of testimony or by solicitor's argument in closing) in the sentencing phase of a death penalty trial is well-settled in post-*Payne* case law, the specific issue of whether it is permissible for the State to make a closing argument regarding the comparative worth of a defendant's life and the victim's life has not been addressed by this Court.

We agree with the PCR court's finding that the solicitor's argument does not suggest that the Smith's life is *worth more* than the Petitioner's life. We do recognize, however, that the solicitor compared the lives of Smith and the Petitioner based on the evidence presented. We now consider whether or not such a comparison is proper. Petitioner asserts this Court has answered this question already in *State v. Southerland*, 316 S.C. 377, 447 S.E.2d 862 (1994). We disagree, and believe Petitioner has misconstrued our decision in *Southerland*. In *Southerland*, the State did not offer any victim impact evidence, but the defendant wanted to introduce evidence of the *victim's bad character*. This Court held that "*Payne* prohibits this use of comparative character analysis." *Id.* at 385, 447 S.E.2d at 867. The Court recognized, "[w]hile evidence of harm caused by the defendant may include evidence of the victim's character, it is not offered to encourage comparative character analysis." *Id.* Upon examination of *Payne*, and other post-*Payne* precedent, we are convinced the Court was referring to comparative character analysis be-

---

8. *State v. Ard*, 332 S.C. 370, 505 S.E.2d 328 (1998), *overruled in part on other grounds by State v. Shafer*, 340 S.C. 291, 531 S.E.2d 524 (2000), *overruled by Shafer v. South Carolina*, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001); *State v. Rocheville*, 310 S.C. 20, 425 S.E.2d 32 (1993); *State v. Johnson*, 306 S.C. 119, 410 S.E.2d 547 (1991), *cert. denied*, 503 U.S. 993, 112 S.Ct. 1691, 118 L.Ed.2d 404 (1992); *Lucas v. Evatt*, 308 S.C. 31, 416 S.E.2d 646 (1992) (finding solicitor's closing argument concerning victims and impact of their murders upon their families did not render trial fundamentally unfair because argument was responsive to defendant's mother's testimony that she loved her son and that his arrest and trial had been very hard on her, and because argument described to jury consequences of defendant's criminal act, impact of murders upon family, and personal characteristics of victims).

tween the victim and other members of the community, not comparisons between the defendant and the victim.[9]

The following passage from *Payne* clarifies this distinction:

Payne echoes the concern voiced in *Booth's* [*Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440] case that the admission of victim impact evidence permits a jury to find that defendants whose victims are assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. (citation omitted). As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but the murderer of a reprobate does not. It is designed to show instead *each* victim's "uniqueness as an individual human being," whatever the jury might think the loss resulting to the community might be.

*Payne*, 501 U.S. at 823–824, 111 S.Ct. at 2607, 115 L.Ed.2d at 734. According to this passage, the comparison prohibited by *Payne* is one between the victim and other members of society; *Payne* does not indicate any concern about comparisons between the victim and the defendant.

Although there is no *per se* bar against victim impact evidence after *Payne*, defendants are not left unprotected. As always, defendants are protected from overly prejudicial evidence by due process. "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608, 115 L.Ed.2d at 735; *Rocheville; Evatt*. In this case then, we must consider whether any of the solicitor's comments in his closing argument were so unduly prejudicial as to render his sentencing fundamentally unfair. Instead of arguing prejudice, however, Petitioner staked his argument on the impropriety of the solicitor's closing in which Petitioner alleged he improperly com-

---

**9.** *See Alvarado v. State,* 912 S.W.2d 199 (Tex.Crim.App.1995) (citing *Southerland* and *Payne* in support of trial court's refusal to admit evidence of a victim's prior bad act because it was not relevant to defendant's "moral blameworthiness" in murdering the victim, the purpose for allowing victim impact evidence espoused in *Payne*).

pared the lives of Petitioner and Smith in order to convey that Smith's life was worth more than Petitioner's life. As discussed, we do not believe this comparison was prohibited by *Payne* or by this Court in *Southerland*. Therefore, the solicitor's comments were not improper and do not warrant reversal unless they were so prejudicial that they rendered the sentencing fundamentally unfair.

In our opinion, the solicitor's closing argument did not render sentencing fundamentally unfair as they did not prejudice Petitioner. The solicitor's comments were based on evidence already in the record. Smith's wife and brother testified during the penalty phase regarding each of the facts about Smith's life upon which the solicitor commented. Petitioner presented the testimony of thirteen witnesses in mitigation during the sentencing phase who attested to Petitioner's at-risk childhood and subsequent criminal acts as a juvenile and young adult, providing all the evidence of Petitioner's character discussed by the solicitor in his closing.

Through the testimony of Petitioner and Smith's family members, both the similarities (the childhood poverty and adversity) and the differences (the manner in which Petitioner and Smith dealt with their circumstances) were readily apparent to the jurors, before the solicitor's closing argument. As permitted by *Payne*, the State offered evidence of Smith's "uniqueness" as an individual by describing the successful ways in which Smith dealt with adversity in his life. Likewise, Petitioner introduced evidence of his own "uniqueness" through the testimony of thirteen witnesses (compared to Smith's two witnesses) regarding his own difficult childhood and background, thereby inviting a comparison between Petitioner and Smith's respective characters even before the solicitor gave his closing remarks. As such, we do not believe the solicitor's comments were so prejudicial (if prejudicial at all) that they rendered Petitioner's death sentence fundamentally unfair under the Due Process Clause. *Payne*.

To reverse the PCR court's denial of relief, this Court must find, first, that counsel was ineffective, and, second, that counsel's ineffectiveness resulted in prejudice. *Payne* does not prohibit character comparisons between defendants and victims; it prohibits comparisons that suggest that there are

worthy and unworthy victims. Therefore, Petitioner cannot establish either the ineffectiveness prong or the prejudice prong of the test as required to overturn the PCR court's denial of relief.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the PCR court's denial of relief.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.