# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Jaron Lamont Gibbs, Appellant.

Appellate Case No. 2017-002042

Appeal From Pickens County
Letitia H. Verdin, Circuit Court Judge

Opinion No. 5760
Submitted May 8, 2020 – Filed August 19, 2020

**AFFIRMED**

Katherine Carruth Goode, of Winnsboro, and Jack B.
Swerling, of Columbia, both for Appellant.

Attorney General Alan McCrory Wilson, Deputy
Attorney General Donald J. Zelenka, Senior Assistant
Deputy Attorney General Melody Jane Brown, and
Assistant Attorney General Caroline M. Scrantom, all of
Columbia, for Respondent.

**HEWITT, J.:** Jaron Lamont Gibbs appeals his convictions for murder and
possessing a weapon while committing a violent crime. He claims the trial court
erred in allowing a police officer to testify about single and double action revolvers
when the officer was not qualified as an expert witness. Gibbs also claims the trial
court erred in allowing the State to reference the officer's testimony in the State's

closing argument and if these alleged errors do not independently justify reversal, reversal is warranted by their cumulative effect.

We respectfully disagree with both arguments. First, we find no abuse of discretion in allowing the officer to testify based on his experience with revolvers. Second, the State's closing argument was permissible advocacy based on its view of the evidence.

## FACTS

Events Giving Rise to Charges

The circumstances of this mid-day shooting were disputed, but multiple witnesses testified the case arose out of a drug transaction. On a Saturday in August 2017, Hunter Raby, Robby Porter, and Kalyn Meadors were going to the lake near Clemson when they contacted Gibbs—the defendant—to buy drugs. Raby drove his white Ford Explorer with Porter in the front passenger seat. Meadors rode in the rear passenger seat. They met Gibbs near Clemson.

Gibbs gave them marijuana and pills in exchange for money. After the transaction, the occupants of Raby's Explorer weighed the marijuana they purchased. Believing they had been shorted, they drove Raby's Explorer back to the purchase location to look for Gibbs and saw him in a Chrysler. They contacted Gibbs by phone and began following the Chrysler.

According to Raby, the phone calls with Gibbs became heated. Shortly thereafter, the two cars arrived and stopped at a four-way intersection. At that point, Gibbs exited the Chrysler's front passenger seat, walked behind the Chrysler, and walked up to the Explorer's driver's side window where Raby was seated. Witness accounts differ as to what happened next.

Raby said Gibbs pulled out a gun, put the gun inside the Explorer's driver's side window, and yelled that Raby had messed up and "was really close to losing [his] life over it." Raby said that the gun was a silver revolver, Gibbs held the gun in his right hand, and Gibbs held the gun along the left side of Raby's face. Raby said he used both of his hands to push the gun away as Gibbs was threatening him. At that point, Raby said the gun fired. Raby denied touching the gun's trigger.

Meadors—the Explorer's backseat passenger—could not see the gun from her seat and only realized what it was after it fired. She assumed Raby had taken the gun away from Gibbs.

Gibbs's story was significantly different.  He said Raby and Porter called him and demanded he settle up for an unpaid bet made at a social event a few weeks earlier. Gibbs said he told them he was on his way to Atlanta and would pay the bet later, but he claimed Porter would not take "no" for an answer.  He said Raby and Porter got increasingly upset as their phone calls went on and they began following closely behind Gibbs and driving aggressively.

Gibbs said the reason he got out of the Chrysler was to offer the gun as payment for the alleged bet.  Gibbs purportedly thought the gun was unloaded.  He agreed that he held the gun in his right hand but explained he was left-handed, he held the pistol by the grip, and his finger was never on the trigger.  Gibbs said he pushed the gun inside the car in front of Raby's face and that Raby pushed the gun back out.  Gibbs said the gun fired when this occurred a second time.  Gibbs claimed he had no idea anyone had been shot after the gun fired.

Three other cars were stopped at the intersection when the shooting happened.  The occupants of those cars all recalled waiting on a silver sedan—the Chrysler—to proceed through the intersection.  All saw Gibbs exit the Chrysler from the passenger side, walk up to the driver's side of the Explorer, and address the driver.

Alexander Saidat, an off-duty EMT waiting at the intersection in his car with his wife and children, recalled seeing Gibbs exit the Chrysler's passenger side and walk to the back of the vehicle.  Saidat said Gibbs had a gun in his right hand that looked like a silver revolver.  Saidat testified Gibbs and the driver of the Explorer had an argument that lasted several seconds.  He then witnessed Gibbs "thrust his right arm inside the vehicle with the gun" and heard the gunshot.

Although the remaining witnesses did not recall seeing a gun, they did recall hearing a gunshot.  Saidat's wife said she witnessed yelling before she "saw the hand of the driver come out, and the gun went off."  She also testified that "[w]hen the gun went off, the male who was in the Chrysler who had shot ran back to the Chrysler and they drove away."  Another witness also recalled "seeing a hand go up and down."

The bullet grazed the top of Raby's head, leaving only a minor injury.  However, the bullet struck Porter—the front seat passenger—in the left side of his temple, just above his ear.  Porter died at the hospital the following day.

Autumn Gilstrap—the Chrysler's driver—testified Gibbs contacted her earlier that day requesting a ride to Atlanta.  She noticed the Explorer trying to stop her from leaving the place where she picked up Gibbs.  Gilstrap said that she drove around

the Explorer, it kept following them, and Gibbs told her to keep driving as he answered a number of phone calls. Gilstrap said the Explorer was directly behind her when they reached the intersection where the shooting occurred.

Gilstrap saw Gibbs walk from her car to the Explorer and saw that he was armed. She said that Gibbs and the people in the Explorer were yelling at each other, and she saw Gibbs point the gun towards the Explorer's window. Gilstrap heard the gun go off and watched Gibbs walk back to her car and get in. Gilstrap said she did not see the gun when Gibbs got back in the car. Gibbs told Gilstrap to drive off and explained that the gun had gone off and hit the top of the Explorer's roof. Gilstrap testified she took Gibbs to Greenville Hospital to meet some other people and declined to drive him to Atlanta "because [she] was unsure of what really happened" at the intersection. Gilstrap said she drove directly to the Clemson Police Department and gave a statement.

Authorities recovered pills and other illegal substances from the Explorer. Raby and Meadors initially told officers that Gibbs had robbed them a few weeks earlier and owed them money. Both of them said later that their initial story was not true, and that the incident in fact stemmed from the aforementioned drug transaction. Gibbs was arrested in Atlanta two days after the shooting. No gun was recovered.

Revolver Testimony

Detective Michael Arflin testified at Gibbs's trial about his investigation of the shooting. The State asked Detective Arflin during direct examination if he was familiar with single action and double action revolvers. Gibbs objected, arguing Detective Arflin had not been qualified as an expert witness. The State responded that the detective had already testified he was "familiar with revolvers through his training and experience as an officer." Gibbs argued he was not aware of any officers that had been trained on revolvers, only semi-automatic weapons and rifles. The trial court overruled the objection and noted Gibbs's standing objection on record.

The following exchange then took place:

> **State:** Detective Arflin, how do you fire a single action gun?
>
> **Detective Arflin:** The hammer has to be cocked and then you fire – you pull the trigger and it discharges.
>
> **State:** Will it fire without you cocking it?

**Detective Arflin:** That's kind of the rule behind single action.  It has to be cocked.

**State:** A double action?

**Detective Arflin:** When you pull the trigger, the hammer both cocks and discharges.

**State:** Does it have a light trigger pull, [or] a heavy trigger pull?

**Detective Arflin:** In double action, it's going to be a long, heavy trigger pull.

Closing Argument

The solicitor made the statement during closing argument that "guns do not accidentally go off."  She then demonstrated the necessary steps for single and double action revolvers to fire.  She argued that if the gun was a single action, "[Gibbs] would have had to have gotten out of the car, [and] cocked it before he put it to [Raby's] head.  That's intent.  That is a conscious effort."  She then described what was necessary for a double action revolver to discharge, arguing:

> Raby testified he pushe[d] the gun up like this.  He would have to push the gun up like this, wrap his fingers around where the trigger [was], pull it back and pull it up at the same time if this was a double action revolver.  That simply does not make sense.

Gibbs objected to the State's argument and demonstration on the basis that there was no evidence a gun could not go off accidentally, especially an old gun that could have been traded on the street.  The trial court overruled the objection.

The jury convicted Gibbs of murder and of the weapons charge.

**ISSUES ON APPEAL**

1.  Whether the trial court erred in allowing a witness who was not qualified as an expert to testify about how single and double action revolvers fire.

2.  Whether the trial court erred in allowing the State to reference the contested testimony in a demonstration during closing argument.

**STANDARD OF REVIEW**

The standard of review is deferential. Evidentiary rulings rest in "the trial court's sound discretion" and we disturb them only "upon a showing of a 'manifest abuse of discretion accompanied by probable prejudice.'" *State v. Commander*, 396 S.C. 254, 262–63, 721 S.E.2d 413, 417 (2011) (quoting *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847–48 (2006)). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result." *Id.* at 212, 631 S.E.2d at 267.

**THE OFFICER'S TESTIMONY**

Gibbs argues Detective Arflin's testimony regarding single and double action revolvers was inadmissible. He hinges his argument on the fact that Detective Arflin was not qualified as an expert and claims the detective's testimony involved "scientific, technical, or other specialized knowledge" and was thus inadmissible from a lay witness.

The State disputes this and argues Detective Arflin offered limited testimony based on his personal experience. The State points to the detective's statement that he was personally familiar with revolvers and claims the testimony was permissible based on his first-hand knowledge, not specialized knowledge.

We agree with the State. As noted above, the State asked Detective Arflin during direct examination if he was familiar with how both single action and double action revolvers operate. The detective explained earlier in his examination that he was indeed familiar with firearms, "both personally and professionally." The State also asked him if he received "training on firearms" and whether he was "familiar with revolvers." The detective answered "yes" to both questions.

Most witnesses may not testify about things outside their first-hand knowledge. *See* Rule 602, SCRE. Experts, however, may testify about things that are outside their personal observation and experience. *See Commander*, 396 S.C. at 267, 721 S.E.2d at 420 (citing multiple authorities including Rule 703, SCRE). A common distinction between expert witnesses and lay witnesses is that most lay witnesses do not state "opinions." Even so, the evidentiary rules allow a lay witness to offer an opinion if certain criteria are met. *See* Rule 701, SCRE.

The testimony at issue here concerns the basic function of certain firearms. We recognize this subject matter may have been foreign to some members of the jury, but the detective testified he was personally familiar with single action revolvers, double action revolvers, and with the difference between them. The key feature of lay testimony is the witness's personal knowledge, not whether the subject of the testimony is beyond the jury's ordinary experience. *See* Rule 602, SCRE. The detective directly stated this testimony was based on his own knowledge.

We note Detective Arflin never offered anything resembling an opinion as to who may have pulled the revolver's trigger or what caused the revolver to fire. For that reason, this case differs from cases in which emergency responders made statements that went beyond their direct observations. *See Fowler v. Nationwide Mut. Fire Ins. Co.*, 410 S.C. 403, 410, 764 S.E.2d 249, 252 (Ct. App. 2014); *State v. Kelly*, 285 S.C. 373, 374, 329 S.E.2d 442, 443 (1985). Here, the testimony is nothing more than the most rudimentary explanation of how someone discharges a revolver. Detective Arflin's limited testimony about single and double action revolvers was thus admissible as proper lay testimony.

## CLOSING ARGUMENT

Gibbs claims there is no evidentiary support for the solicitor's statement during closing argument that guns do not "accidentally" fire. As with the trial court's ruling on Detective Arflin's testimony, we respectfully disagree with Gibbs's argument that the trial court erred in allowing the State to reference the detective's testimony in a demonstration during closing argument.

Closing arguments must not appeal to personal biases or "be calculated to arouse the jurors' passions or prejudices." *Humphries v. State*, 351 S.C. 362, 373, 570 S.E.2d 160, 166 (2002). Arguments should instead stay within the record and reasonable inferences from the record. *Id*. Even so, a solicitor is entitled to act as an advocate and, just like the defense, make the case for how he or she believes the jury should interpret the evidence. *See id.* ("A solicitor has a right to state his version of the testimony and to comment on the weight to be given such testimony.").

We find the comments here qualify as permissible advocacy based on the evidence. After the solicitor made the statement that guns do not accidentally fire, the solicitor described the steps someone would have to take for single and double action revolvers to discharge. The thrust of this argument was two-fold. First, if the revolver had been a double action, the State believed it was unlikely Raby

wrapped his finger around the trigger and applied enough force to fire the weapon when pushing the gun away from his face. Second, if the revolver was instead a single action, the only way it could have fired was if Gibbs cocked the pistol first; demonstrating malice.

The statement "guns do not accidentally go off" is certainly imprecise when viewed through the clear lens of hindsight because a firearm's trigger can obviously be depressed by accident. However, a reasonable juror would have no issue understanding the State's point.

One other thing bears mentioning. Gibbs's story was that he held the gun in his non-dominant hand, held it by the grip alone, and his finger was not on the trigger. One theory of his defense was that his finger had not depressed the trigger and that Raby had inadvertently done so.

We see nothing wrong with Gibbs making that argument. We mention it only to say that it was equally fair for the State to point out that *someone* had to pull the trigger for the gun to fire, and maybe even cock the gun first, and it was unlikely for Raby to have done either.

**CONCLUSION**

Based on the foregoing, the court's order is

**AFFIRMED.**[1]

**LOCKEMY, C.J., and GEATHERS, J., concur.**

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.