OPINION
WILKINSON, Circuit Judge:
Shawn Paul Humphries received a sentence of five years for criminal conspiracy, twenty years for attempted armed robbery, and death for the murder of Mendal “Dickie” Smith. After exhausting appropriate state remedies, Humphries filed an unsuccessful habeas petition in federal district court. He claimed that he received ineffective assistance of counsel under the Sixth and Fourteenth Amendments because of his counsel’s failure to object to the State’s closing arguments at sentencing, which compared the respective worth of the life of the victim to that of Hum-phries. Humphries also claimed that the State’s failure to notify him of the use of victim impact evidence violated his right to *268 a fair trial under the Due Process Clause of the Fourteenth Amendment. The district court dismissed the petition.
We affirm in part, and vacate and remand in part. The South Carolina Supreme Court reasonably interpreted federal law when it found no constitutional violations concerning the extent of notice about the introduction of victim impact evidence. On the facts of this case, however, we find that the failure of Hum-phries’ counsel to object to the State’s extensive and egregious use of comparative human worth arguments amounted to ineffective assistance of counsel. This omission by Humphries’ counsel was, on these facts, so unduly prejudicial that it rendered the jury’s recommendation of a capital sentence fundamentally unfair. We thus affirm Humphries’ convictions, but we vacate the sentence of death and remand to the district court with instructions that the writ be issued solely for purposes of resentencing.
I.
On August 5, 1994, a jury convicted Shawn Paul Humphries of the murder of Mendal “Dickie” Smith in Fountain Inn, South Carolina. On the morning of January 1, 1994, Humphries, then age 22, and Eddie Blackwell, then age 19, had been drinking beer when they decided to rob a convenience store run by Smith. Hum-phries flashed a gun he had stolen the night before and demanded Smith’s money. Smith appeared to reach under the convenience store counter to get a gun, and Humphries responded by firing a single, fatal shot at Smith. Humphries was successfully prosecuted in South Carolina state court, and a jury convicted him of attempted armed robbery, possession of a firearm during the commission of a violent crime, criminal conspiracy, and murder. On August 9, 1994, Humphries was sentenced to death for murder, twenty years for attempted armed robbery, and five years for criminal conspiracy.
The South Carolina Supreme Court affirmed Humphries’ conviction and sentence on direct appeal, and the Supreme Court denied certiorari. See State v. Humphries, 325 S.C. 28, 479 S.E.2d 52 (1996), cert. denied, 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997). Humphries’ application for post-conviction relief in South Carolina state court was dismissed by the Common Pleas Court on December 21, 1998, and his appeal was rejected by the South Carolina Supreme Court on August 26, 2002. See Humphries v. State, 351 S.C. 362, 570 S.E.2d 160 (S.C.2002). Humphries then filed for habeas relief in federal district court. The district court dismissed Humphries’ habeas petition, but subsequently granted a certificate of ap-pealability for the issues now before this court. See 28 U.S.C. § 2253(c) (2000).
II.
We review de novo a district court’s decision on a petition for writ of habeas corpus based on a state court record. Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 555 (4th Cir.1999); see also Bell v. Ozmint, 332 F.3d 229, 233 (4th Cir.2003). If a state court has resolved the merits of a claim for post-conviction relief, a federal court may not grant a writ of habeas corpus unless the state court’s holding “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254(d)(1), or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2).
In the present case, we focus on the question of whether the state court decision “was contrary to, or involved an un *269 reasonable application of, clearly, established Federal law.” 28 U.S.C. § 2254(d)(1). A state court decision is contrary to clearly established federal law if the state court “applies a rule that contradicts the governing law set forth in [the Supreme Court’s] cases.” Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision involves an unreasonable application of clearly established federal law if it “correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner’s case.” Id. at 407-08, 120 S.Ct. 1495.
The requirements Humphries must satisfy in demonstrating an unreasonable application of clearly established federal law under § 2254(d)(1), however, are onerous. As the Supreme Court has recently reiterated,
“a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly. Rather, it is the habeas applicant’s burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.”
Price v. Vincent, 538 U.S. 634, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam) (internal quotations omitted)). Notably, an “ ‘unreasonable application of federal law is different from an incorrect application of federal law.’ ” (Woodford 537 U.S. at 25, 123 S.Ct. 357 (quoting Williams, 529 U.S. at 410, 120 S.Ct. 1495)) (emphasis in original).
Humphries argues that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments when his counsel failed to object to the State’s closing arguments at sentencing, in which the State compared the general worth of Humphries’ life to that of the victim. He also claims that the State’s failure to provide notice that it intended to introduce victim impact evidence in the sentencing proceedings violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment.
III.
We consider first Humphries’ claim of ineffective assistance of counsel. For the reasons explored below, we conclude Hum-phries has satisfied the foregoing requirements in arguing his counsel rendered ineffective assistance in failing to object to the prosecution’s argument for the imposition of the death penalty. The Supreme Court has concluded that a prosecutor may appropriately argue, and a jury may appropriately consider, “victim impact” evidence relating to the victim’s personal characteristics at a capital sentence hearing. Payne v. Tennessee, 501 U.S. 808, 823, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Recognizing that precedent, the stringent requirements AEDPA places on the grant of federal habeas relief, and mindful of the serious consideration given to this matter by prior courts, we are nevertheless constrained to conclude that, because of the use to which the “victim impact” evidence was put in this case, Humphries is entitled to federal habeas relief under § 2254(d)(1).
A.
The Supreme Court has laid out a two-part test for evaluating claims of ineffective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant “must show that counsel’s performance was deficient.” Id. at 687, 104 S.Ct. 2052. To establish this deficiency, *270 the defendant must produce evidence that the “counsel’s representation fell below an objective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052.
Second, the defendant must show that the deficient performance resulted in actual prejudice to his case. A showing of prejudice requires the defendant to prove that “counsel’s errors were so serious as to deprive the defendant of a fair trial.” Id. at 687, 104 S.Ct. 2052. In the context of a capital sentencing proceeding, the question is whether “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052. Prejudice is established in a capital case where the jury is considering both aggravating and mitigating evidence during sentencing if “there is a reasonable probability that at least one juror would have struck a different balance,” but for the constitutional error. Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 2543, 156 L.Ed.2d 471 (2003).
The Strickland standard is a difficult one to satisfy, and for good reason. Counsel must often make instantaneous decisions without the luxury of hindsight that appellate courts, and especially habeas courts, enjoy. See Truesdale v. Moore, 142 F.3d 749, 753-54 (4th Cir.1998). But there are some actions or omissions that are so prejudicial that a reviewing court must necessarily recognize counsel’s errors as ineffective assistance. The failure of Humphries’ counsel to object to the State’s sentencing arguments comparing the overall worth of Humphries’ life with that of the victim constitutes such a case of constitutionally deficient representation with a clearly prejudicial effect.
B.
In his closing arguments, the State’s solicitor repeatedly emphasized the comparative worth of the lives of the victim and of the defendant. While the solicitor did not use the actual words “comparative worth” or “value,” he insistently and systematically contrasted the apparently virtuous and productive life of the victim with Humphries’ allegedly worthless existence, and asked jurors to impose a death sentence on that basis.
The solicitor began his closing arguments by announcing that, in addition to considering mitigating and aggravating evidence, the jury would:
... have evidence about the character of the Defendant to consider. And you’re going to have evidence about the victim, Dickie Smith, to consider, because I would submit to you that he is as much a part of this portion of this trial as is Shawn Paul Humphries.
If the solicitor had merely used victim impact evidence to illustrate the “victim’s uniqueness as an individual human being,” Payne, 501 U.S. at 823, 111 S.Ct. 2597 (internal quotations omitted), his actions would be beyond scrutiny. The prosecution could further have independently challenged the character and criminal history of the defendant, and Humphries’ counsel would have had no grounds to lodge a sustainable objection.
The problem is that the prosecutor did not stop there. Instead, he drew repeated comparisons between the value and worth of the victim’s life and that of the defendant, an argument which any reasonable observer would have found designed to secure a death sentence from the jury. The way in which the victim led his life was contrasted, at identical points in time, with the way the defendant had led his. For example, the solicitor stated that:
[I]n 1984 [Dickie Smith, the victim] met Pat, and they fell in love, and they got married. That’s the same year Shawn *271 Paul Humphries committed two house breakins at age 13. 1986 Dickie makes a pretty drastic move. He decides he’s going to quit Kemet and go build homes full-time, and he goes out, and he starts building homes in the community he had grown up in. That’s the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia.
Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old stepdaugher — stepsister, said, “Please don’t put Shawn Paul Hum-phries in the electric chair.” I’m sorry I did not feel it was appropriate to bring in a six year old girl Ashley and parade her in front of you.
In 1988 Ashley is born. That’s the same year Shawn Paul Humphries went to jail for two years. And in the spring of 1992, I believe, Dickie Smith, opens the doors to the MaxSaver, building a business in that community.
The State’s clear purpose in using this time line was to contrast the life of the victim with the life of the defendant in order to exhort the jury to return a death sentence on the basis of the latter’s relative lack of worth. The solicitor emphasized that “Dickie Smith is as much about this case as Shawn Paul Humphries.” He rhetorically asked the jury “Who is the victim here, Shawn Paul Humphries or is it Dickie Smith?” and argued for the death penalty by asking the jury “if not in a case with a character like this, if not in a ease when somebody like Dickie Smith is taken, then when are you going to do it?” He concluded by telling the jury that, while weighing the evidence of aggravation and mitigation, they should consider that “when you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances.” This argument was set forth without objection, and the jury, as noted, recommended a sentence of death.
C.
Victim impact evidence has an important and legitimate place in capital sentencing proceedings. The Supreme Court in Payne v. Tennessee has made clear that “if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.” Payne, 501 U.S. at 827, 111 S.Ct. 2597. “A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim’s family is relevant to the jury’s decision as to whether or not the death penalty should be imposed.” Id. As its name thus suggests, victim impact evidence allows the jury “a quick glimpse of the life” that a defendant “chose to extinguish”; it demonstrates the full impact of a crime, not only on the victim, but also on loved ones left behind. Id. at 822, 111 S.Ct. 2597 (internal quotations omitted).
The facts of Payne plainly illustrate the use to which such evidence may be put. The case involved the murder of a twenty-eight-year-old mother and her two-year-old daughter whom the defendant viciously stabbed to death with a butcher knife. The Payne Court approved the introduction of victim impact evidence concerning the physical and psychological harm inflicted on the victim’s three-year-old son who was also stabbed repeatedly, yet survived, and who thus witnessed the murder of his mother and sister.
Yet, while the states plainly “remain free, in capital cases, as well as others, to devise new procedures and new remedies *272 to meet felt needs,” id. at 824-25, 111 S.Ct. 2597, neither Payne nor any other Supreme Court case has suggested that victim impact evidence may be used without limit, constraint, or reference to the harm caused by the crime to those aggrieved. To the contrary, the Payne Court clearly limited the introduction and use of victim impact evidence by prohibiting victim impact evidence “that is so unduly prejudicial that it renders the trial fundamentally unfair.” Id. at 825, 111 S.Ct. 2597.
In particular, the Supreme Court has disapproved of the use of victim impact evidence to make comparative human worth arguments. The Payne Court noted the concern “that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy.” Id. at 823, 111 S.Ct. 2597. The Court concluded that:
As a general matter ... victim impact evidence is not offered to encourage comparative judgments of this kind — for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead each victim’s “uniqueness as an individual human being,” whatever the jury might think the loss to the community resulting from his death might be. Id. at 823, 111 S.Ct. 2597 (emphasis in original).
The Payne Court also laid out a framework for drawing the line between the legitimate and illegitimate uses of victim impact evidence. The Court found that “[i]n the majority of cases ... victim impact evidence serves entirely legitimate purposes.” Id. at 825, 111 S.Ct. 2597. But it concluded that “[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.” Id. at 825, 111 S.Ct. 2597. Victim impact evidence that emphasizes the harm a murder caused the victim, his family, and his loved ones is unquestionably legitimate. However, the comparative worth argument presented in this case, calling for a death sentence based on the relative value of Sean Hum-phries’ life vis-a-vis Dickie Smith’s, falls squarely within the category of prosecuto-rial conduct that may be so prejudicial that it renders a trial fundamentally unfair.
The South Carolina Supreme Court held that Payne only prohibited comparisons between the relative worth of victims, rather than comparisons between victims and perpetrators. See Humphries v. State, 351 S.C. 362, 570 S.E.2d 160, 167-68 (2002). It is true that a comparison of one victim to another may differ from a comparison of a victim to a defendant. The former permits the introduction of collateral evidence — the worthiness of other members of society — while the latter invites a commentary on evidence already before the jury. Nonetheless, distinguishing these two types of human worth comparisons splits an awfully thin hair. Both comparisons miss the main point of Payne, which is that victim impact evidence must be used to further the traditional purposes of sentencing: namely that a sentence reflect such factors as the nature and severity of the crime, the consequences of the crime upon the unique lives of the victim and his family, or the criminal history of the defendant. To permit a sentence of death to be returned on the explicit and pointed comparative worth argument in this case pushes Payne so far that the major objective of victim impact evidence is lost, which is “informing the sentencing authority about the specific harm caused by the crime in question.” Payne, 501 U.S. at 825, 111 S.Ct. 2597. This focus on *273 the consequences of the crime ensures that victim impact evidence promotes rather than retards the fundamental purposes of the sentencing function. See id. at 820, 111 S.Ct. 2597 (noting that the objective of the Sentencing Guidelines is to calibrate sentences “to the subjective guilt of the defendant and to the harm caused by his acts”).
It is undeniable that “ ‘[t]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentence!’ that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.’ ” Payne, 501 U.S. at 825, 111 S.Ct. 2597 (quoting Booth v. Maryland, 482 U.S. 496, 517, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (White, J., dissenting)). The State here claimed that its comparisons between the victim and the defendant merely advanced this legitimate purpose and served as nothing more than a comment on the evidence. The dissent notes that the sentencing proceeding included evidence about both the victim’s unique life and the perpetrator’s at-risk childhood and subsequent criminal acts. See Humphries v. State, 351 S.C. 362, 570 S.E.2d 160, 167-68 (2002). It stresses that all of the solicitor’s arguments were based on evidence that was properly included in the record. Id.
We do not at all suggest this evidence was inadmissible. The state court properly admitted the victim-impact evidence. Our fíne dissenting colleague notes the testimony of Randy and Pat Smith, Dick-ie’s brother and wife. But we have found no error in the admission of their testimony. Much of the solicitor’s closing argument also conformed to the strictures of Payne. That the facts from which the prosecutor drew his comparison were already in the record, however, does not cure the prejudice resulting from the format in which the prosecutor chose to present a significant portion of his close. The comparison between the victim and perpetrator that formed the focus of closing argument reached the point at which differences in degree ripen into differences in kind. The State did not simply seek to explore the tragic consequences of this crime for the victim’s family and community or to lay out the victim’s uniqueness as an individual. Nor was its argument confined to addressing the defendant’s past criminal record or history. Rather, it sought, point-by-point and year-by-year, to demonstrate to the jury unambiguously that at the very instant one life was being put to good use, the other was not. This side-by-side comparison of the relative value of two lives was calculatedly incendiary and rendered the sentencing fundamentally infirm.
We recognize that many capital sentencing proceedings are going to focus upon the persons of the victim and the perpetrator. This is especially true since Payne approved many uses of victim impact evidence. It may be to the advantage of the defendant to portray the victim of the offense unsympathetically, and it may be to the advantage of the prosecution to paint the victim and his family in a feeling manner and to cast doubt on the defendant’s mitigating evidence. All of this is well within the bounds of permissible argument. But Payne warns against the type of argument in support of the death penalty based on comparative human worth employed here. See Payne, 501 U.S. at 825, 111 S.Ct. 2597. To argue that a murderer merits mercy because he killed “only” a prostitute or drug user, rather than a philanthropist, would strike us as profoundly lawless. Similarly, to argue that a defendant should be sent to death because his life was of less value than his victim is to *274 ask a jury to decide, not on the character of the crime, not on the consequences of the crime, not on the criminal record of the perpetrator of the crime, but on some unfettered evaluation of human worth that works improper prejudice.
The words “Equal Justice Under Law” are engraved over the entrance of the United States Supreme Court as a symbol of the law’s commitment to treat all litigants as individuals of equal dignity. See Lyng v. Castillo, 477 U.S. 635, 636 n. 2, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). This individuality is compromised, however, when prosecutors implore juries to hand down death sentences on theories of comparative human worth. The past lives which this jury was exhorted to balance bore no connection or relation, save for the tragic events surrounding Dickie Smith’s murder, and yet the State engaged in sweeping comparisons of both. The very concept of a sentence should have operated to preclude the comparison. One does not receive a sentence for leading a less valuable life than someone else. One receives a sentence under our system for having committed a crime.
This is certainly the view of the Supreme Court, which has described victim-impact evidence as but another means of “informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities.” Payne, 501 U.S. at 825, 111 S.Ct. 2597. By contrast, the comparative worth argument relied on here ranged far afield and fell within the category of factors that the Supreme Court has prohibited as unduly prejudicial in the death penalty sentencing context. See Johnson v. Mississippi, 486 U.S. 578, 584-85, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (quoting Zant v. Stephens, 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)) (prohibiting death penalty decisions “predicated on mere ‘caprice’ or on ‘factors that are constitutionally impermissible or totally irrelevant to the sentencing process’ ”). The comparison of what Humphries and Smith happened to be doing in 1984 or 1986 or 1988 or at some fortuitous past point in their separate lives is the essence of an arbitrary and capricious circumstance. That Dickie Smith happened to be building houses while Shawn Paul Humphries happened to be breaking into houses is a judgment freighted with comparative moral import. It was not, however, a permissible basis under the Due Process Clause on which to condemn the defendant to death. Juries are free to mete out capital verdicts based on the evidence before them, the consequences of the crime for the victim’s family and loved ones, the presence or absence of a variety of aggravating or mitigating circumstances, or the sheer heinousness of the offense. See, e.g., South Carolina Code § 16-3-20(C). All of these factors are focused on the individuals qua individuals and are not comparative in nature. But one thing the centerpiece of closing argument cannot invite is a sentence on the basis that one person is of more intrinsic value than someone else. Payne, 501 U.S. at 823, 111 S.Ct. 2597. A defendant may not be condemned simply for being deemed, over the long trajectory of life, a less estimable human being than his victim.
This sort of comparison is foreign to most sentencing regimes. In the wake of Payne, the federal government, the military, and thirty-three of the thirty-eight states with the death penalty have authorized the use of victim impact evidence in capital sentencing. John H. Blume, Ten Years of Payne: Victim Impact Evidence in Capital Cases, 88 Cornell L.Rev. 257, 267 (2003). Unsurprisingly, while these jurisdictions allow a broad range of victim impact evidence, none sanctions the sort of *275 comparative worth arguments advanced in this proceeding. To place the matter in perspective, the United-States Sentencing Guidelines contemplate a multitude of enhancements and departures for factors such as the knowing selection of a vulnerable victim, U.S.S.G. § 3A1.1, the perpetrator’s aggravating role in the offense, U.S.S.G. § 3B1.1, the abuse of a position of trust or use of a special skill in committing the offense, U.S.S.G. § 3B1.3, the infliction of significant physical or extreme psychological injury on the victim, U.S.S.G. § 5K2.2, 5K2.3, the use of a weapon or dangerous instrumentality in the commission of the crime, U.S.S.G. § 5K2.6, and the crime’s purpose of facilitating or concealing another offense, U.S.S.G. § 5K2.9. One can look in vain among these enhancements and departures for any factor remotely resembling the relative worth of the victim’s and defendant’s lives. Such a factor would hardly form the basis of a two-level increase, much less the imposition of a sentence of death. If we ignore Payne’s condemnation of the use of comparative human worth arguments, we invite future abuses. As the trial judge exclaimed, this was “one of the best arguments I have ever heard in my life given in a closing argument ... in terms of the technique, ... delivery, effectiveness.” The argument was so effective, however, precisely because it was so improperly prejudicial to Humphries, and ignored the bedrock premise that “punishment should be directly related to the personal culpability of the criminal defendant,” California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Connor, J., concurring).
A number of state courts have recognized the dangers of indulging arguments contrasting the human worth of a victim and a defendant. See, e.g., State v. Koskovich, 168 N.J. 448, 776 A.2d 144, 182 (2001) (holding that “the court’s directive to jurors that they balance the victim’s background against that of defendant was akin to asking the jury to compare the worth of each person,” which is “inherently prejudicial” and “might prompt jurors to impose the death penalty arbitrarily”); State v. Muhammad, 145 N.J. 23, 678 A.2d 164, 179 (1996) (“Victim impact testimony may not be used ... as a means of weighing the worth of the defendant against the worth of the victim.”); State v. Storey, 901 S.W.2d 886, 902 (Mo.1995) (en banc) (finding ineffective assistance of counsel because of the failure to object to prosecutor’s arguments: “Whose life is more important to you? Whose life has more value? The Defendant’s or [the victim’s]?”). We recognize that our own review here is on collateral attack. However, the fact that the State can point to no court that has sustained an argument like the instant one bears on the question of whether the state court’s adjudication was a reasonable one in light of the controlling Supreme Court precedents. The State can only point to two cases which purport to reconcile Payne with comparative worth arguments. See State v. Haselden, 357 N.C. 1, 577 S.E.2d 594, 610 (2003) (upholding a prosecutor’s argument that compared the worth of the victim and defendant); Jackson v. State, 33 S.W.3d 828, 843 (Tex.Crim.App.2000) (upholding an argument encouraging the jury not to impose a life sentence, which compared the defendant’s importance to the victim’s). These two cases are distinguishable inasmuch as the comparisons between the victims and defendants were nowhere near as extensive or egregious as in this case, which stands alone in its resort to the year-by-year chronology of two lives for the sole purpose of drawing an invidious comparison between them.
D.
Humphries’ counsel should have known that the State’s comparative worth *276 arguments were constitutionally infirm and objected accordingly. Yet neither of Hum-phries’ two counsel objected to the State’s comparative worth arguments at trial. They did lodge a general challenge to the admissibility of victim impact evidence without prior notice, which they reserved for appeal. But they were remarkably silent during the comparative worth arguments, and admitted after trial that their failure to object constituted ineffective assistance of counsel.
This court must of course “indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” Truesdale v. Moore, 142 F.3d 749, 753-54 (4th Cir.1998). But the State’s comparative worth arguments, which were at once without precedent and at odds with traditional precepts of due process, should have struck those learned in the law like a bucket of ice water. The failure of Humphries’ counsel to object to these arguments fell “below an objective standard of reasonableness,” Strickland, 466 U.S. at 688, 104 S.Ct. 2052, and was constitutionally deficient.
Moreover, the State’s comparative worth arguments were sufficiently prejudicial that they rendered the sentencing “fundamentally unfair.” Payne, 501 U.S. at 825, 111 S.Ct. 2597. These forms of arguments represent the types of appeals to jurors that the Supreme Court has long condemned in the death penalty context. The Supreme Court “has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake.” Eddings v. Oklahoma, 455 U.S. 104, 118, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (O’Connor, J., concurring). And “[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.” Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion). Given the force of the comparative worth arguments made by the State at the critical juncture of the prosecution’s closing argument, we safely conclude that “there is a reasonable probability that at least one juror would have struck a different balance,” but for the constitutional error. Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 2543, 156 L.Ed.2d 471 (2003).
Respecting, as we do, the strictures of the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), we must nonetheless vacate the sentence. Our holding, however, remains a narrow one. We appreciate that closing arguments pack emotional punch. We recognize the undesirability of requiring counsel to lodge frivolous or counterproductive objections and the desirability of affording each side at a capital sentencing proceeding the latitude of an uninterrupted close. We acknowledge that the standards for the submission of evidence in sentencing are permissive, see State v. Gulledge, 326 S.C. 220, 487 S.E.2d 590, 594 (1997), and that much of the State’s attempt to underscore the impact of the loss of this exemplary citizen’s life upon his family and friends was permissible under Payne v. Tennessee. And we emphasize yet again that the failure to object here was not to general, oblique, or inadvertent comparisons of victim and defendant, which may be almost inescapable in light of the Payne decision. Rather the failure to object pertained to a year-by-year, side-by-side chronology of two past lives with the sole objective of comparing the worthiness and value of them. It was this explicit resort to notions of relative human worth unrelated to the crime at issue that traduced basic *277 standards of due process. The failure of Humphries’ counsel to object to these arguments fell below the Strickland threshold, clearly prejudiced the defendant, and compromised the jury’s recommendation of death.
IV.
Humphries raises an additional claim which bears on his trial and resentencing. He asserts that the State’s failure to notify him of the use of victim impact evidence during sentencing violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. Humphries also asserts that his counsel reasonably believed at the time of the trial that South Carolina Code § 16-3-20(B) entitled Hum-phries to receive advance written notice of aggravating factors that would be used at trial, which implicitly included victim impact evidence. Humphries’ counsel claim that they prepared for trial on the assumption that victim impact evidence was not going to play a role at any phase of the proceeding. If they had known that victim impact evidence would be used, they would have selected jurors differently, reconfigured an expert witness’s testimony, and conducted a more thorough investigation of the victim’s background.
To begin with, Humphries cannot raise a state law issue in a federal habeas petition, which exists for the purpose of redressing unconstitu-tional detentions. See Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (“[F]ederal habeas corpus relief does not lie for errors of state law.”). He seeks to avoid this difficulty by contending that the South Carolina statute at issue is really nothing more than an expression of federal due process principles. Even if we were to accept this contention, however, Humphries’ claim would still fail.
South Carolina Code § 16-3-20(B) provides that at the sentencing phase of a capital trial, “[o]nly such evidence in aggravation as the State has informed the defendant in writing before the trial is admissible.” The South Carolina Supreme Court on direct appeal noted that the statute lists certain aggravating factors requiring notice. Victim impact evidence is not listed as an aggravating factor and therefore presumptively does not require notice. See State v. Humphries, 325 S.C. 28, 479 S.E.2d 52, 55 (S.C.1996).
Even if the statute did somehow require notice of victim impact evidence before trial, Humphries received written notice that the State intended to introduce certain facts in evidence including “all circumstances surrounding the commission of these crimes.” At the trial itself, the State listed the victim impact witnesses on its witness lists, and the State asserted that it had clear discussions with the defense about presenting victim impact evidence only during the sentencing phase of the trial.
The notice could certainly have been more explicit concerning the planned introduction of victim impact evidence, but the State was not obligated under either the South Carolina statute or the Due Process Clause to detail the victim impact evidence with greater specificity. As the South Carolina Supreme Court found: “Capital defendants are as free as the State to gather information relating to the characteristics of the murder victim, and, therefore, generally have a fair and complete opportunity to respond to the State’s factual allegations.” State v. Humphries, 479 S.E.2d at 55. Humphries had the opportunity to gather and present information to rebut the victim impact evidence. The fact that he hired a private investigator to explore the victim’s background suggests *278 that he did in fact avail himself of this opportunity.
Humphries similarly claims a due process violation because “the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain.” Gardner v. Florida, 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). He asserts this occurred because he allegedly did not receive proper notice concerning the introduction of victim impact evidence and, therefore, could not adequately prepare his defense in advance. This claim fails for many of the same reasons as the prior one. Hum-phries knew or reasonably should have known that victim impact evidence would be used by the State during the sentencing proceedings. He thus had ample opportunity to investigate and rebut that evidence. As the district court found, there is no law that clearly requires timely, specific, and express notice of victim impact testimony, and Humphries can point to no pertinent federal authority to substantiate his claim. The South Carolina Supreme Court thus reasonably interpreted federal law to find that the admission of victim impact evidence did not violate his right to a fair trial under the Due Process Clause of the Fourteenth Amendment.
V.
Capital trials in our federal system must remain largely the province of the states. And victim impact evidence has many good and legitimate uses, among them awakening juries to the tragic toll of serious crime. But the comparison here was an abuse of this powerful prosecutorial tool, an abuse which no reasonable attorney would sit and greet with silence. It should not need saying that in our country capital sentences do not rest on the scales of relative human worth.
We affirm petitioner’s convictions. We vacate his sentence of death, and remand with directions that the writ issue solely for pur-poses of resentencing.

AFFIRMED IN PART; VACATED AND REMANDED IN PART