601 S.E.2d 335

Larry Eugene **HALL**, Petitioner,

v.

**William D. CATOE, Director, South Carolina Department of Corrections, Respondent.**

No. 25850.

Supreme Court of South Carolina.

Submitted March 17, 2004.

Decided Aug. 9, 2004.

Rehearing Denied Sept. 9, 2004.

354

Teresa L. Norris and Jerome H. Nickerson, of the Center of Capital Litigation, both of Columbia, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia, for Respondent.

Chief Justice TOAL:

We granted certiorari to determine whether the post-conviction relief (PCR) court erred by denying inmate Larry Hall ("Hall") relief on the death sentence he received as a result of a murder conviction. We remand Hall's case for a new sentencing proceeding.

## FACTUAL/PROCEDURAL BACKGROUND

In July 1991, Hall committed a series of crimes in an Easley Wal–Mart parking lot. To begin, Hall robbed and sexually assaulted his first victim at gunpoint. Hall then ordered her to walk to the back parking lot with him. A Wal–Mart employee noticed Hall's strange behavior and drove a truck through Hall and the victim's path. Hall allowed her to escape and then walked into the woods behind the store waving his gun in the air.

A half hour later, Hall approached two teenage girls, who were sisters, in the back parking lot. In front of numerous witnesses and without provocation, Hall shot and killed the two girls. When the police arrived and finally cornered Hall, he challenged the police with a piece of wood and dared the police to shoot him.

Hall has both mental and physical disabilities. He currently takes, and was taking during trial, Dilantin and Phenobarbital to prevent epileptic seizures. Dilantin has a sedative effect similar to the effects of alcohol. At the time of his arraignment, Hall had twice the amount of Dilantin in his bloodstream than the normal therapeutic amount.[1] Hall's sister, mother, and former employer all testified that Hall's seizures and medications make it very difficult for him to complete simple everyday tasks and that he is often in a "daze" or "in the fog." Hall has a "grossly abnormal" EEG,[2] as the result of his having epilepsy.

---

1. Dr. James Brice, Hall's family physician, saw Hall shortly after the court hearing. Dr. Brice ordered blood tests, which revealed that Hall's Dilantin level was 39. The normal therapeutic range is 10–20.

2. An EEG (electroencephalograph) monitors the electric impulses of the brain, allowing doctors to detect and diagnose brain dysfunction.

Hall has been diagnosed with "sensory dysfunction," deficient language abilities, and deficient organizational abilities. He suffers from both organic personality disorder—which may cause uncontrollable mood shifts and outbursts of aggression—and schizoid personality, which makes Hall indifferent to praise or punishment. Hall is also borderline mentally retarded, having an IQ of 72.

In August 1991, six months before Hall's trial, a group of doctors at the Hall Institute in Columbia evaluated Hall and found him competent to stand trial. One doctor, however, testified that Hall's competency was "borderline" and a "touch and go" issue. Hall was not evaluated again before his trial.

During closing argument, the solicitor directed the jury to weigh the worth of Hall's life against the lives of Hall's victims: "[w]hat are the lives of these two girls worth? Are they worth at least the life of a man, the psychopath, this killer who stabs and stabs and kills and rapes and kidnaps?" Hall was then convicted of murder, kidnapping, first-degree criminal sexual conduct, armed robbery, and resisting arrest and was sentenced to death.

Hall subsequently applied for PCR, and the PCR judge denied relief directing the state to draft an order, which the trial judge adopted in full, without alterations. This Court granted certiorari to review the following issues:

I. Did the PCR judge err in applying a heightened burden of proof to determine whether Hall was competent to stand trial?

II. Was Hall's trial counsel ineffective for failing to object to the solicitor's closing argument, which compared the worth of Hall's life to the victims' lives?

III. Did the PCR judge err in adopting the state's proposed order in its entirety?

## LAW/ANALYSIS

### Standard of Review

■ This Court must determine whether any probative evidence exists to support the denial of post-conviction relief. *Cherry v. State,* 300 S.C. 115, 119, 386 S.E.2d 624, 626 (1989).

If any probative evidence exists, the PCR judge's ruling should be upheld. *Id.*

## I. COMPETENCY TO STAND TRIAL

### A. Burden of Proof

■ Hall argues that the PCR judge applied the wrong standard of proof in deciding whether Hall was competent to stand trial. We disagree.

■ A defendant must prove that he is incompetent to stand trial by a "preponderance of the evidence." *State v. Reed*, 332 S.C. 35, 39, 503 S.E.2d 747, 749 (1998). Holding a criminal defendant to a "clear and convincing" burden to prove incompetence is a violation of due process. *Cooper v. Oklahoma*, 517 U.S. 348, 350, 116 S.Ct. 1373, 1375, 134 L.Ed.2d 498 (1996).

In his order, the PCR judge stated that Hall failed to establish "with credible and convincing evidence" that he was incompetent to stand trial. Hall argues that "credible and convincing" evidence is synonymous with "clear and convincing" evidence, which is not the appropriate standard of proof for determining a defendant's competency to stand trial. However, after reviewing the order in its entirety, we find that the trial judge used the correct burden of proof—a preponderance of the evidence. In fact, the PCR judge noted several times that Hall must prove his incompetence by a "preponderance of the evidence."

First, in his order, the PCR judge stated that "[i]n a state post-conviction relief hearing, the Applicant also bears the burden of proof and he is required to show by a preponderance of the evidence that he is entitled to relief. Rule 71.1(e), SCRCP. This Court finds that he has failed this burden."

Second, in finding that Hall was not prejudiced by ineffective assistance of counsel, the PCR judge stated, "Hall has a burden of proof at trial to show by a preponderance of the evidence that he was incompetent. This Court finds, to a reasonable probability, he has failed in his burden."

We note that the PCR judge's order should have been amended to exclude the "credible and convincing" language, alleviating any doubt concerning which standard the PCR

judge applied. Nevertheless, after reviewing the order in its entirety, we find that the judge applied the proper standard—preponderance of the evidence—to determine whether Hall was competent to stand trial.

## B. Evidence of Petitioner's Competency to Stand Trial

■ On July 16, 1991, three days after Hall's arrest, the trial court ordered Hall to be evaluated for his competency to stand trial. A group of doctors at the Hall Institute found Hall to be competent to stand trial, with one doctor reporting that Hall's mental state was a "close call" and a "touch and go" issue. Since the 1991 evaluations, the parties have accumulated a mass of evidence and engaged in a "battle of the experts" as to Hall's competency to stand trial. Hall argues that, although he was found competent in August 1991, he was not competent during his trial, which took place in January 1992. We find a sufficient amount of evidence supporting the PCR judge's conclusion that Hall was competent to stand trial.

■ Conviction of a criminal defendant who is not competent to stand trial violates the due process clause of the fourteenth amendment. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). This Court has held that to be competent to stand trial or continue trial, a defendant must have "a rational, as well as factual, understanding of the proceedings against him" and the "ability to consult with his lawyer with a reasonable degree of rational understanding." *State v. Bell*, 293 S.C. 391, 395–96, 360 S.E.2d 706, 708 (1987) (citing *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)).

■ If there is "any evidence of probative value to support the post conviction judge's factual findings," we must affirm. *Cherry*, 300 S.C. at 119, 386 S.E.2d at 626. Nevertheless, if the PCR judge makes an error of law, then this Court must reverse. *Pierce v. State*, 338 S.C. 139, 145, 526 S.E.2d 222, 225 (2000). In addition, the PCR judge has the duty to weigh the credibility of the doctors who have testified as to Hall's competency to stand trial. If the testimony supports the PCR judge's findings, then the findings should be upheld. *Solomon v. State*, 313 S.C. 526, 443 S.E.2d 540 (1994); *Wade v. State*, 308 S.C. 552, 419 S.E.2d 781 (1992) (a finding that testimony in

support of allegations was unconvincing, without credibility, and untruthful will be upheld on appeal).

This Court has held that the PCR judge erred in granting relief on the basis that the defendant was not competent to stand trial when (1) counsel testified at the PCR hearing that he had no trouble communicating with the defendant; (2) the trial transcript showed that the defendant clearly understood the questions asked and responded in an appropriate manner; and (3) a forensic psychiatrist evaluated the defendant prior to trial and found the defendant's medical conditions did not affect his mental state. *McLaughlin v. State*, 352 S.C. 476, 575 S.E.2d 841 (2003).

Hall presents several arguments that he was incompetent to stand trial: (1) he has been diagnosed with an antisocial disorder; (2) his trial counsel testified that he believed that Hall was not competent during trial; (3) Hall suffered from a seizure the night before sentencing, indicating that he could have experienced periods of incompetency; (4) during trial, he had taken abnormal doses of Dilantin causing him to be groggy and sedated; and (5) his low IQ indicates he has the intelligence of an average eleven-year-old.

Conversely, the state presents a sufficient amount of probative evidence that Hall was competent to stand trial: (1) in August 1991, several psychologists conducted an extensive evaluation of Hall and found him to be competent to stand trial; (2) Dr. McKee, who evaluated Hall from July 23, 1991 to August 8, 1991, found that "his answers to his questions were well associated, goal directed and relevant; there was no evidence of delusional thinking" and that he was capable of "understanding and participating in his defense and is capable of understanding the charges against him"; (3) one of Hall's defense counsel, Dallas Ball, testified in a May 29, 1997 deposition that "[i]n the discussions with Mr. Hall throughout the case ... [Hall] understood what he was facing, and he listened to the testimony each day as to what was said against him, and he understood what was going on"; (4) during the PCR hearing, defense counsel, Christopher Olson (Olson), testified that Hall told him that he shot the other girl because she was an eyewitness to the first shooting, indicating that Hall knew the consequences of his actions; and (5) Olson also

testified that none of the doctors indicated any need to reevaluate Hall before trial.

We find that a sufficient amount of probative evidence exists to support the PCR judge's ruling that Hall was competent to stand trial. Moreover, given that the PCR applied the correct burden of proof, we hold that the PCR judge correctly determined that Hall was competent to stand trial.

## II. CLOSING ARGUMENT

■ Hall argues that trial counsel was ineffective because counsel failed to object when the solicitor made the following statement in his closing argument:

> I am talking about values, because a jury verdict is a statement of values. And I am not talking about dollars and cents as far as what the [lives of the two girls were] worth, but nevertheless it is a question of values. What are the lives of these two girls worth? Are they worth the life of this man, the psychopath, this killer who stabs and stabs and kills, and rapes and kidnaps.

Hall argues that his trial counsel's failure to object allowed the solicitor to charge the jury with an arbitrary, misconceived sentencing analysis, violating Hall's right to due process. We agree.

■ A criminal defendant is constitutionally entitled to effective representation. *Rogers v. State*, 261 S.C. 288, 199 S.E.2d 761 (1973). In order to find trial counsel ineffective, this Court must find that counsel's conduct was deficient and that the deficiency prejudiced the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In the past, the United States Supreme Court (USSC) did not explicitly recognize the state's right to offer victim impact evidence in a criminal trial. In *Booth v. Maryland*, the USSC "left open the possibility that the kind of information contained in victim impact statements could be admissible if it 'related directly to the circumstances of the crime.'" 482 U.S. 496, 507, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987)). Additionally, in *South Carolina v. Gathers*, the USSC affirmed this Court's ruling that "victim impact statements in capital sentencing proceeds violate [the] principle that a sentence of death must

be related to the moral culpability of the defendant." 490 U.S. 805, 810, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).

But in 1991, the USSC overruled *Gathers* and *Booth,* holding:

> if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than any other relevant evidence is treated.

*Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

In other words, "[v]ictim impact evidence, as any other relevant evidence, is admissible so long as it is not so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* However, "[a]s a general matter, **victim impact evidence is not offered to encourage comparative judgments** of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not." *Id.* at 823, 111 S.Ct. at 2607 (emphasis added). Under a similar line of reasoning, this Court held that a criminal defendants reprehensibility was not mitigated by the fact that the victim was a murderer himself. *State v. Gaskins,* 284 S.C. 105, 326 S.E.2d 132 (1985).

At first glance, our decision in *Humphries v. State* appears to allow a solicitor to compare the lives of a criminal defendant with that of the defendant's victim. 351 S.C. 362, 376, 570 S.E.2d 160, 168 (2002). Nonetheless, we do not extend *Humphries* to permit the state to encourage the jury to compare the worth of a defendant's life with that of his victims. In *Humphries,* we upheld Humphries's death sentence and held that the solicitor's comparison of the lives of Humphries and his victim was within the realm of permissible victim impact evidence. In *Humphries,* defense counsel, attempting to mitigate the effects of the state's evidence concerning the brutality

of the murder, elicited testimony that Humphries was a victim of parental abuse, substance abuse, and poverty as a child.[3]

In his closing argument, the solicitor responded by comparing the lives of Humphries and his victim. Although both Humphries and his victim were reared in impoverished conditions, Humphries was in and out of jail while the victim maintained an ordinary, crime-free life. We held that the solicitor's argument was permissible victim impact evidence.[4]

Again, the solicitor's argument in Hall's trial is distinguishable from the solicitor's argument in *Humphries*.

In *Humphries* we recognized that it is more prejudicial for the state to compare the worth of the life of the defendant

---

3. Humphries presented thirteen witnesses who testified as to his cruel childhood.

4. We recognize that the Fourth Circuit recently granted Humphries federal habeas corpus, finding that the state (1) compared the **worth** of Humphries's life with that of his victim and (2) did so for the primary purpose of "exhort[ing] the jury to return a death sentence on the basis of the [defendant's] relative lack of worth." *Humphries v. Ozmint*, 366 F.3d 266, 271 (4th Cir.2004). We also take notice that the Fourth Circuit granted the state's petition for rehearing *en banc* and will rehear the case in October 2004. Nevertheless, we disagree that the victim-defendant comparison found in our account of *Humphries* is as prejudicial as the comparison in the present case. We continue to distinguish the facts of *Humphries* with that of the present case and maintain that these factual differences yield a different result as a matter of law. Our interpretation of the law coincides most congruently with Senior Judge Hamilton's dissent in the Fourth Circuit's recent account of *Humphries:*
 > [A]llowing the introduction of victim-impact evidence does not, and should not, open the door to evidence/argument ultimately allowing the jury to make a comparative inquiry between the victim and other victims in society, as the court in *Payne* apparently recognized.
 > . . .
 > Put simply, clearly established Supreme Court precedent does not prohibit victim-to-defendant comparisons; they are inevitable in any capital case in which the jury is asked to assess the persuasive force of the defendant's mitigating evidence and the victim-impact evidence.

 *Id.* at 288.
 We recognize that those victim-to-defendant comparisons that render a trial fundamentally unfair and those victim-to-defendant comparisons that are permissible are not always clearly distinguishable. A comparison that constitutes permissible victim-impact evidence is not as prejudicial to a defendant as a comparison that imposes, what in effect is, an arbitrary, unfounded jury charge.

with that of his victim than it is to compare their lives based on the evidence presented. *Id.* at 374, 570 S.E.2d at 167–168. In the present case, the solicitor not only suggested that Hall's life was worth less than his victims', he developed an arbitrary formula whereby if the jury finds Hall's life worth less than his victims', then the jury could reach no other conclusion than that the death penalty is justified.

Further, while **the solicitor** in *Humphries* compared the histories of Humphries's and his victim's lives, the solicitor in *Hall* asked **the jury** to compare the **worth** of Hall's life with that of his victims'.

We hold that the solicitor impermissibly compared Hall's life to the victims' lives. We find that the solicitor's comparison (1) was so emotionally inflammatory that it became a material part of the jury's deliberation process; (2) unquestionably directed the jurors to conduct an arbitrary balancing of worth, which required that Hall be sentenced to death if the jury found Hall's life was worth less than the lives of his victims; (3) is totally unrelated to the circumstances of the crime; and (4) is distinguishable from traditional impact evidence in that it was not actually offered to show the impact of the crime on the victims or the victims' family.

For these reasons, we hold that Hall was denied his constitutional right to effective assistance of counsel when his trial counsel failed to object to the solicitor's comparison between the worth of Hall's life and the lives of the victims.

### III. ADOPTION OF THE STATE'S PROPOSED ORDER IN FULL

Hall argues that the PCR judge erred in adopting the state's proposed order because the order did not resolve issues of fact, indicating that the judge did not render an independent judicial judgment. We disagree.

The commentary to South Carolina Appellate Court Rule 501, Canon 3 B(7)(e) provides that "[a] judge may request a party to submit proposed findings of fact and conclusions of law, so long as the other parties are apprised of the request and are given an opportunity to respond to the proposed findings and conclusions." Further, in *Pruitt v. State,* this Court directed that:

[c]ounsel preparing a proposed order should be meticulous in doing so, opposing counsel should call any omissions to the attention of the PCR judge prior to issuance of the order, and the PCR judge should carefully review the order prior to signing it. Moreover, after an order is filed, counsel has an obligation to review the order and file a Rule 59(e), SCRCP, motion to alter or amend if the order fails to set forth the findings and the reasons for those findings as required by § 17–27–80 and Rule 52(a), SCRCP . . . .

310 S.C. 254, 256, 423 S.E.2d 127, 128 (1992).

On November 12, 1999, after receiving a request from the PCR judge to do so, the state submitted a proposed order to both the judge and opposing counsel. On November 14, 1999, the PCR judge told the parties that he would "carefully review the proposed order and insure that the facts and conclusions of law are as I find them to be."

 Although we strongly encourage PCR judges to draft their own findings of fact and conclusions of law in death penalty cases, we also acknowledge that in all other cases, it is common practice for judges to ask a party to draft a proposed order for the sake of efficiency. In the present case, the evidence sufficiently indicates that the PCR judge spent an adequate amount of time reviewing the order before adopting it. Further, Hall waived his right to make this challenge when he failed to file a motion to alter or amend the order. *Id.*

### CONCLUSION

We REVERSE the PCR court on the basis that Hall's counsel was ineffective for not objecting to the solicitor's closing argument, which included an instruction to the jury to compare the worth of Hall's life with the lives of his victims. Accordingly, we REMAND for a new sentencing proceeding. Finally, we affirm the PCR judge's ruling on the remaining issues.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.