WILKINSON, Circuit Judge,
dissenting:
No person should be executed in America on the theory that his life is of less worth than that of someone else. This principle is not only clearly established in federal law; it is anciently so. Neither a defense attorney, nor a state court judge, nor his federal counterpart should need any prompting to object to a death sentence that is premised on a principle of comparative human worth. Because the majority’s opinion fails to respect the ban on such comparisons, and in the process strays perilously close to endorsing them, I respectfully dissent.
There should be no doubt that this case presents a violation of this sort. The prosecutor made no bones about what he did. He baldly compared the general worth of the victim’s existence with that of the defendant and urged the jury to impose a death penalty on that basis. This sort of argument should not serve as a prelude to *236 any sort of punishment, much less to a capital sentence.
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supremé Court made clear the many good and legitimate uses of victim impact evidence. Without a doubt, victim impact evidence serves an important role in our criminal justice system. It affords a multitude of avenues for impressing on the jury the peculiar anguish of the loss from violent crime. Indeed, victim impact evidence may become more important as the severity of the offense increases. It is certainly warranted in a capital sentencing proceeding, where the loss to family and friends is most profound and where the murder has robbed the prosecution of a critical witness.
But what happened here was a perversion of all that is proper under Payne. Punishment in our system reflects those things for which an individual defendant is responsible, not notions of the relative value of respective human lives. The prosecutor took leave of the bedrock principle that punishment rests on the circumstances of the crime, the consequences for its victims, and the defendant’s criminal history. Rather than seek a capital sentence on these traditional and wholly defensible bases, the prosecutor strayed into territory whose forbidden nature should have been self-evident.
Indeed, the majority is able to point to no other argument that even approaches the egregiousness of this prosecutor’s comments and no other case in which a court has tolerated such misconduct. There is a reason for this telling lacuna in the majority opinion — the wrongfulness of putting people to death on the basis of comparative human worth arguments is now, and was at the time of Humphries’ sentencing, clearly forbidden. I would therefore affirm ' Humphries’ conviction, -but I would issue the writ for purposes of resentenc-ing. I regret that I take such exception to the views of my distinguished colleagues and able concurring brother on this issue, but I do.*
I.
The majority’s defense of the state solicitor’s closing argument begins with the claim that it contains no transgression that would warrant our censure. My colleagues claim that this argument “simply did not invite the jury to return a sentence based on the relative worth of the lives of Dickie Smith and Humphries.” Maj. Op. at 221. To support this proposition, the majority attempts to submerge the prosecutor’s improper weighing of human worth at the end of his argument in the sea of legitimate evidence already before the jury. But close examination of the solicitor’s final presentation to the jury betrays the futility of this apology.
The solicitor began his closing arguments at the sentencing phase by sketching the contours of the evidence he would discuss. He announced:
You look at four things in deciding the issue of punishment. You look at the aggravation. Is it an aggravated murder? You look at the character of the Defendant. You look at any mitigation, statutory mitigation or other mitigation they’ve presented to you. And the last thing you look at is the victim, his uniqueness. What harm to the community and to the victim and to the family did this Defendant cause? Those are the four things you look at.
*237 This outline of the evidence was entirely unremarkable. Indeed, the Supreme Court has generally endorsed the propriety of each of its elements. See, e.g., Simmons v. Smith Carolina, 512 U.S. 154, 163, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (aggravating factors including the defendant’s “prior criminal history”); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (mitigating evidence).
The prosecutor was therefore well within constitutional bounds in his exegesis of the first three sections. The trial evidence received, the witness testimony at sentencing, and the prosecution’s closing argument discussed in turn the aggravating circumstances of the crime, Humphries’ criminal history, and the mitigating evidence offered by the defendant. The testimony the prosecutor elicited for the final element of his presentation, concerning the victim’s uniqueness, was similarly sound. Dickie Smith’s relatives appeared before the jury without objection and recounted their recollections of the victim and what he had meant to each of them. Indeed, had the solicitor stopped at this juncture, his actions would have been beyond scrutiny.
The problem was that the solicitor did not stop. In his commentary on the victim impact evidence, the prosecutor took leave of his announced intention to discuss “the victim, his uniqueness” and the “harm to the community and to the victim and to the family” that the defendant’s crime had caused. Instead, he launched into a general human worth comparison that could not have been more removed from his stated purpose of showing Dickie Smith as a unique and individual human being. This stark detour should have been obvious from the solicitor’s first mention of the defendant in the narrative of the victim’s own life:
[I]n 1984 [Dickie Smith] met Pat, and they fell in love, and they got married. That’s the same year Shawn Paul Hum-phries committed two house break-ins at age 13. 1986 Dickie makes a pretty
drastic move. He decides he’s going to quit Kemet and go build homes full-time, and he goes out, and he starts building homes in the community he had grown up in. That’s the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia.
Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old stepdaughter — stepsister, said, “Please don’t put Shawn Paul Hum-phries in the electric chair.” I’m sorry I did not feel it was appropriate to bring in a six year old girl Ashley and parade her in front of you.
In 1988 Ashley is born. That’s the same year Shawn Paul Humphries went to jail for two years. And in the spring of 1992, I believe, Dickie Smith opens the doors to the MaxSaver, building a business down in that community.
The majority claims that the solicitor meant only to foreground “Dickie Smith’s uniqueness as an individual” in this part of his closing argument and contends that the vignettes from the victim’s life did nothing more than further this purpose. Maj. Op. at 212-13, 220. The majority keeps repeating that the prosecutor’s comments did not involve a human worth comparison. But it never begins to explain why not. Indeed, the majority never tells us why Shawn Paul Humphries’ full name needed to occur at all — let alone three times — in the part of the closing argument that was expressly previewed to the jury as an entirely legitimate discussion of Dickie Smith as an individual human being. Because the prosecutor avoided using words such *238 as “compare” or “value” or “worth,” my colleagues also assert that this portion of his argument cannot credibly be regarded as one of comparative human worth. Id. at 220-21, 222. I cannot accept this characterization. Indeed, if this argument is not deemed to be one of comparative human worth, then I cannot conceive of an argument that would merit that designation.
The solicitor’s comparisons simply leave no room for explanations of inadvertence, or of an unintentional verbalization of an errant train of thought. Indeed, such glancing or implicit comparisons may be all but unavoidable in a sentencing proceeding focused on the persons of the victim and the perpetrator. Yet the prosecution here uttered identically-phrased comparisons for three separate occasions — comparisons that took on the air of a refrain. All of these comparisons mentioned the defendant by his. full name and all employed the same dramatic construction, “[t]hat’s the same year Shawn Paul Humphries.... ” The record thus presents no general, oblique, or inadvertent comparisons of the victim and defendant. Rather, the prosecution sought point-by-point, side-by-side, and year-by-year to demonstrate to the jury that at the very instant one life was being put to worthwhile use, the other was not.
Thus, far from showing the victim as an individual, the prosecution presented two largely separate lives in tandem. In this regard, the comparison went far beyond the only two cases raised by the State that purport to reconcile Payne with comparative worth arguments, State v. Haselden, 357 N.C. 1, 577 S.E.2d 594, 610 (2003), and Jackson v. State, 33 S.W.3d 828, 843 (Tex.Crim.App.2000). Neither of those cases sought to advance the sort of human time chart the prosecution ventured here. Neither deliberately sought to take past events in two unrelated lives for the sole purpose of comparing the general worth of the victim’s and the defendant’s existence. Indeed, in Haselden, the case on which the majority chiefly relies, Maj. Op. at 224 n.7, the most it can muster up is a single sentence which did not begin to approach the prosecutor’s extensive exploration of relative worth in the Humphries’ case.
Other courts have not hesitated to censure violations of a less horrific sort than that which happened here. In State v. Koskovich, 168 N.J. 448, 776 A.2d 144 (2001), the court held that a “directive to jurors that they balance the victim’s background against that of defendant was akin to asking the jury to compare the worth of each person,” which is “inherently prejudicial” and “might prompt jurors to impose the death penalty arbitrarily.” Id. at 182. Likewise the court in State v. Muhammad, 145 N.J. 23, 678 A.2d 164 (1996), emphasized that “[vjictim impact testimony may not be used ... as a means of weighing the worth of the defendant against the worth of the victim.” Id. at 179. State v. Storey, 901 S.W.2d 886 (Mo.1995) (en banc), meanwhile, found ineffective assistance of counsel in the failure to object to prosecutor’s argument, “[wjhose life is more important to you? Whose life has more value? The Defendant or [the victim’s]?” Id. at 902. And the South Carolina Supreme Court only recently overturned a capital sentence which had been returned after a prosecutor asked the jury whether “the lives” of the victims were “worth” that of the “killer.” Hall v. Catoe, 360 S.C. 353, 601 S.E.2d 335, 339 (2004). While the prosecutor may have used the word “worth” in his argument, his comments did not rise to the level of a studied and comparative chronology of two peoples’ lives, as we have before us here.
In the face of these precedents, I am surprised the majority clings to its defense *239 of the prosecutor’s peroration in this trial. For the case law leaves the majority literally alone in its willingness to sanction executions on the basis of extended weigh-ings of relative human worth.
Any lingering doubts one might have about the State’s purpose should be thoroughly dispelled by considering how the solicitor drew his comments to a close. He returned to the notion that “Dickie Smith is as much about this case as Shawn Paul Humphries” by rhetorically asking “[w]ho is the victim here, Shawn Paul Humphries or is it Dickie Smith?” He legitimately implored the jury to return a capital sentence by asking “if not in a case with a character like this, if not in a case when somebody like Dickie Smith is taken, then when are you going to do it?” It was another ending exhortation, however, that left the jury in no doubt: “[Wjhen you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances.” This concluding flourish served only one purpose: to hammer home the point that already infused the multiple specific comparisons of episodes from those two lives that the solicitor had just set forth: Shawn Hum-phries had led a worthless life, Dickie Smith had led a worthy one, and a death sentence was warranted on this basis.
The majority contends finally that the prosecution’s argument in its entirety involved no more than permissible comments on the evidence. My colleagues emphasize that all of the discussion of the past lives of the victim and the defendant had already been submitted into evidence at the sentencing hearing. The majority notes that “the solicitor’s life history comparison contained in the year-by-year chronology was based upon facts established during the trial [that] were readily apparent to the jury.” Maj. Op. at 221.
I do not suggest this evidence was inadmissible. To the contrary, the victim impact evidence was properly submitted. The testimony of Dickie Smith’s brother, Randy, and his wife, Pat, was all legitimately designed to underscore the importance of the victim’s life to his family members, to his friends, and to the community he served. Comment upon this evidence would clearly conform to the strictures of Payne and the rhetorical embellishment of the evidence would be well within the latitude afforded closing arguments.
But that is not what occurred in this case. That the facts from which the prosecutor drew his comparison were already in the record does not cure the prejudice resulting from the format in which the prosecutor chose to present a significant portion of his close. The comparison between the victim and perpetrator that formed the focus of this closing argument reached the point at which differences in degree ripen into differences in kind. The State did not seek simply to comment on the evidence. The State did not seek simply to explore the terrible consequences of this crime for the victim’s family and community or to lay out the victim’s uniqueness as an individual. The State sought to present two peoples’ lives in a crafted invitation to the jury to compare their relative worth. This side-by-side comparison of the relative value of two lives was calculatedly incendiary and rendered the sentencing fundamentally infirm.
Viewed against the backdrop of this message, the majority’s suggestion that the prosecutor obeyed the prohibition on judgments of comparative human worth by avoiding the words “compare” and “value” or “worth” is a simple invitation to subterfuge, condoning egregious human worth comparisons in substance so long as cer *240 tain phrases are avoided. Likewise, the concurrence’s suggestion that the prosecution was doing no more here than saying Humphries “could have made better choices” is untenable. Cone. Op. at 249. The prosecutor could have argued the tragic nature of Humphries’ choices, underscored his responsibility for those choices, and attacked Humphries’ mitigating evidence all day long without indulging an argument of relative human worth. Left with no explanation for the comparison that occurred here, let alone a plausible one, I can only state again what appears so obvious from the record: that the prosecutor told the jury that the intrinsic value of one life over time was less than that of another, and that a sentence of death was warranted on that basis.
II.
This case comes to us on collateral review. In reviewing a state court judgment on collateral attack, our obligations of deference to state court proceedings are quite plain. Congress has declared that a federal court may not grant a writ of habeas corpus unless the state court’s holding “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254(d)(1) (2000), or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2). The question before us is simply whether the state court’s decision in this case violated clearly established federal law by applying “a rule that contradicts the governing law set forth in [the Supreme Court’s] cases.” Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
The majority and I agree that the pivotal case in this analysis is Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). But while we agree that Payne is the applicable case, we could not disagree more on what Payne plainly holds. Payne unequivocally endorsed the use of victim impact evidence in capital proceedings, but it never came close to placing any imprimatur on the sort of closing argument the prosecutor offered here. In fact, the Supreme Court issued plain warnings to steer clear of human worth comparisons, warnings which I regret to say the majority has not heeded.
A.
Payne itself provides a good example of the uses to which victim impact evidence may be put. The case involved the murder of a twenty-eight-year-old mother and her two-year-old daughter whom the defendant viciously stabbed to death with a butcher knife. The Payne Court approved the introduction of victim impact evidence concerning the physical and psychological harm inflicted on the victim’s three-year-old son who was also stabbed repeatedly, yet survived, and who thus witnessed the murder of his mother and sister. Testimony by surviving relatives of the victim provides a paradigm case for the use of victim impact evidence, regardless of whether those survivors actually witnessed, as the young boy did in Payne, the commission of the crime.
Payne made clear that victim impact evidence, or “evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim’s family,” has an important and legitimate place in capital sentencing. 501 U.S. at 817, 111 S.Ct. 2597. States are permitted to introduce such evidence to offer the jury “a quick glimpse of the life which a defendant chose to extinguish, or [to demonstrate] the loss to the victim’s family and to society which has resulted from the *241 defendant’s homicide.” Id. at 822, 111 S.Ct. 2597 (quoting Mills v. Maryland, 486 U.S. 367, 397, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (Rehnquist, C.J., dissenting))(internal quotations omitted). Grounding a capital sentence in considerations of this sort does not violate the traditional precepts of sentencing. On the contrary, victim impact evidence informs the jury of the “specific harm caused by the crime in question,” id. at 825, 111 S.Ct. 2597, and the consequences of a criminal act have long been a factor on which punishment may properly rest. Id. at 819-20, 825, 111 S.Ct. 2597. For this reason, forbidding states from allowing victim impact evidence in sentencing proceedings would reduce the deceased to a “faceless stranger at the penalty phase of a capital trial [and] may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.” Id. at 825, 111 S.Ct. 2597 (quoting South Carolina v. Gathers, 490 U.S. 805, 821, 109 S.Ct. 2207, 104 L.Ed.2d 876 (O’Connor, J., dissenting)) (internal quotations omitted).
Payne also rebutted in turn each argument against victim impact evidence that had informed the earlier decisions of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). While Booth and Gathers asserted that such evidence led to arbitrary imposition of the death penalty, the Payne Court found that any effect on the incidence of capital sentences was consonant with the principle that punishment may be calibrated to fit the harm a crime had caused. See Payne, 501 U.S. at 825, 111 S.Ct. 2597. While Booth and Gathers were concerned that victim impact evidence would frustrate the defendant by forcing a diversion of attention from his case in mitigation to the victim’s character, the Payne Court concluded that this was no more prejudicial than the many tactical decisions that must be made in the course of capital litigation. Id. at 823, 111 S.Ct. 2597. While Booth and Gathers believed that the individualized consideration of a defendant required in a capital case prohibited victim impact evidence, the Payne Court protested that the victim should likewise be accorded individual respect. Id. at 822, 825, 111 S.Ct. 2597. Finally, the Payne Court determined that the approach to sentencing underlying Booth and Gathers had been too narrow, criticizing the premise of those cases that victim impact evidence “do[es] not in general reflect on the defendant’s ‘blameworthiness,’ and that only evidence relating to ‘blameworthiness’ is relevant to the capital sentencing decision.” Id. at 819, 109 S.Ct. 2207.
Payne thus endorses, explicitly and unequivocally, the use of victim impact evidence at the punishment phase of a capital trial. Yet, while the states plainly “remain free, in capital cases, as well as others, to devise new procedures and new remedies to meet felt needs,” id. at 824-25, 111 S.Ct. 2597, neither Payne nor any other Supreme Court case has suggested that victim impact evidence may be used without limit, constraint, or without reference to the harm caused by the crime to those aggrieved. This fundamental idea of harm caused the victim and his family by the crime of the defendant pervades the Payne opinion. Indeed, it is mentioned by the Court as the rationale for victim impact evidence no fewer than ten times. See id. at 819, 111 S.Ct. 2597 (victim impact evidence is relevant for the “harm caused by the defendant as a result of the crime”); id. at 820, 111 S.Ct. 2597 (sentences are commonly calibrated to the “harm done by the criminal”); id. (sentencing judge’s discretion is properly guided by consideration of the “harm caused by the crime”); id. at 821, 111 S.Ct. 2597 *242 (describing federal and state sentencing reform that enables “the sentencing authority to consider information about the harm caused by the crime committed by the defendant”); id. (victim impact evidence is “designed to portray for the sentencing authority the actual harm caused by a particular crime”); id. at 825, 111 S.Ct. 2597 (factors generally relating to “specific harm” caused by crime have long been “considered by sentencing authorities”); id. (evidence submitted was “illustrative of the harm caused by Payne’s double-murder”); id. (states may properly authorize consideration of “specific harm caused by the defendant” in assessing punishment); id. at 826, 111 S.Ct. 2597 (evidence submitted “illustrated quite poignantly some of the harm that Payne’s killing had caused”); id. (sentencer may “bear in mind” such “harm” while also considering defendant’s mitigating evidence).
Notably absent from the Court’s discussion is any hint of imprimatur for human worth comparisons, let alone of the naked variety that occurred here. For human worth comparisons are so far removed from the Court’s central concern of harm that it is inconceivable that the Court somehow meant to allow them. Indeed the human worth comparison offered in this case presents the very antithesis of Payne’s rationale for victim impact evidence. Evidence introduced to inform the sentencing authority of the “specific harm” caused by the crime in question, id. at 825, 111 S.Ct. 2597, is the very opposite of comment weighing the general value of the victim’s and defendant’s entire lives. Testimony focusing on the consequences of the crime in question ensures that victim impact evidence promotes rather than retards the fundamental purposes of the sentencing function. Argument drawing a comparative judgment of human life roams far afield from the consequences of the criminal act.
Indeed, one searches the Payne opinion in vain for any indication that the Court meant to condone such comparative judgments. In the one part of the opinion where the Court considers comparative appeals of this sort, it does so only to condemn them. Payne considers the question, raised in Booth, of whether victim impact evidence might permit “a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy.” Id. at 823, 111 S.Ct. 2597 (citing Booth, 482 U.S. at 506 n. 8, 107 S.Ct. 2529). In response to this possibility, the Court professes incredulity, noting that
[a]s a general matter ... victim impact evidence is not offered to encourage comparative judgments of this kind — for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead each victim’s ‘uniqueness as an individual human being,’ whatever the jury might think the loss to the community resulting from his death might be.
Id. at 823, 111 S.Ct. 2597. The Court noted that “[i]n the majority of cases ... victim impact evidence serves entirely legitimate purposes.” Id. at 825, 111 S.Ct. 2597. But it chose to conclude its discussion in precise terms. It stated that “if the State chooses to permit the admission of victim impact evidence” ■— previously defined as the “personal characteristics of the victim and the emotional impact” of the crime, see id. at 817, 111 S.Ct. 2597 — “and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.” Id. at 827, 111 S.Ct. 2597.
The Court’s discussion of victim impact evidence in Payne therefore signals a clear *243 disapproval for the kind of interpersonal comparison that occurred here. The South Carolina Supreme Court held (and the majority appears to agree) that Payne only prohibited comparisons between the relative worth of victims, rather than comparisons between victims and perpetrators. See Humphries v. State, 351 S.C. 362, 570 S.E.2d 160, 167-68 (2002). It is true that a comparison of one victim to another may differ from a comparison of a victim to a defendant. The former permits the introduction of collateral evidence — the worthiness of other members of society — while the latter invites commentary on evidence already before the jury. Nonetheless, distinguishing these two types of human worth comparisons splits an awfully thin hair.
In fact, contrary to the majority’s claim that comparative worth judgments are “inevitable” after Payne, Maj. Op. at 222 n.6, 225 n.9, a fair examination of the case reveals that the Court did not even believe that arguments of this sort would be raised in capital proceedings, much less proffered as the basis for the death sentence. The pairing of two people, one actual and one supposed, contemplated by the example which Payne condemns, see 501 U.S. at 823, 111 S.Ct. 2597, does not suddenly become acceptable when the hypothetical element of the dyad is replaced by the prosecutor with the person of the defendant.
Quite the opposite, it is the relative nature of these sorts of judgments that provoked the Court’s disapproval, not the imaginative leap that resort to a conjectural comparator requires. Life in our society is not the relative matter that the prosecutor tried to make it. Each life stands instead on a footing of its own. This is the essential point the Court expresses. Otherwise it is impossible to imagine why the Court would tether its overruling of Booth and Gathers to their holdings “that evidence and argument relating to the victim and the impact of the victim’s death on the victim’s family are inadmissible at a capital sentencing hearing,” id. at 830 n. 2, 111 S.Ct. 2597, why it would take pains to emphasize that some victim impact evidence, otherwise proper, might be so prejudicial that “it renders the trial fundamentally unfair,” id. at 825, 111 S.Ct. 2597, and why it would see fit to emphasize that proper victim impact evidence shows “each victim’s ‘uniqueness as an individual human being.’ ” Id. at 823, 111 S.Ct. 2597 (emphasis added in part).
To this point, I have confined myself to a textual analysis of the Payne opinion. But an overview of Payne leads to the very same conclusion as a textual dissection, namely that a victim’s status as “an individual human being,” id., does not allow human worth comparisons, let alone approve them. An overview of Payne and its sentencing philosophy is necessary because it likewise forfends the majority’s conclusion.
The Payne Court had to proceed at a high level of generality because the decisions it overruled had already ascended to this register. Booth, for instance, held that sentencing evidence must relate only to the defendant’s blameworthiness. See id. at 818-19, 111 S.Ct. 2597 (citing Booth, 482 U.S. at 504, 505, 107 S.Ct. 2529). But Payne criticizes the conception of punishment set forth in Booth and Gathers as too cramped. Instead, a sentencer can properly consider the “harm caused by the defendant as a result of the crime charged.” Id. at 819, 109 S.Ct. 2207. The Court thus explicitly extends the preoccupation in Booth with “the subjective guilt of the defendant” to encompass also “the harm caused by his acts.” Id. at 820.
The significance of Payne is that it added harm to Booth’s discredited insistence *244 that sentencing evidence must relate solely to the defendant’s blameworthiness. See id. at 818-19, 111 S.Ct. 2597 (citing Booth, 482 U.S. at 504, 505, 107 S.Ct. 2529). Payne envisions blame and harm as the two organizing categories of sentencing evidence. Indeed, Payne stands for the proposition that the relevance of arguments in capital sentencing should be grounded in at least one of these two principles. And it is possible, no doubt, to reconstruct the chain of reasoning that supports such a relationship for every category of evidence that state and federal sentencing law permits. Criminal history, for instance, relates to blame. See, e.g., U.S.S.G. Ch. k, intro, comment (“A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment.”) Victim impact evidence of the sort Payne contemplated, meanwhile, relates in like manner to harm.
Comparative human worth judgments, in stark contrast, defy classification under this rubric. For in their general resort to the respective worthiness of human lives, they do not bear in the slightest on the defendant’s culpability or the deleterious consequences of his criminal act. Indeed, the majority offers not one argument that relates human worth comparisons to either of these seminal concepts. Instead, the majority retreats behind nebulous pronouncements about “the boundaries of a question the jury was required to consider,” Maj. Op. at 223, and observations that “[t]he bulk of the solicitor’s argument was not that Humphries should die because his life was worth less than Dickie Smith’s.” Id. at 220. Propositions such as these simply ignore both what the prosecutor said and what he did in breaching the principles that Payne was all about.
The majority concludes its own review of Payne by saying that the opinion has “a few shortcomings,” Maj. Op. at 225 n.9, and that it has made human worth comparisons “inevitable.” Id., 222 n. 6. For its part, the concurrence likewise finds fault with Payne, because it dismisses inconvenient statements in that opinion as “dicta,” Cone. Op. at 229, 230, thus ignoring the Supreme Court’s explanation of the basis for its own decision. I do not think Payne has any “shortcomings.” Far from making human worth comparisons “inevitable,” Payne condemns them by stressing the quality of a victim as an individual human being. See Payne, 501 U.S. at 825, 111 S.Ct. 2597. Thus there was nothing at all “inevitable” about this prosecutor’s decision to take leave of the focus on Dickie Smith and Shawn Paul Humphries as individuals and launch into an argument which, by laying their two lives side-by-side, undermined that individuality. If this were all so “inevitable,” one wonders why it is the only argument in this country to indulge such an extended and explicit weighing of the relative worth of human life.
The extent of the State’s transgression is, sadly, beyond salvaging through the aforementioned standard of review. For due process at its core contains a commitment to treat all litigants as individuals of equal dignity. See Lyng v. Castillo, 477 U.S. 635, 636 n. 2, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986). This individuality is compromised, however, when prosecutors implore juries to hand down sentences on theories of comparative human worth. The past lives this jury was exhorted to balance bore no connection or relation, save for the tragic events which brought the parties into court. Yet the State engaged in sweeping comparisons of the life histories of the victim and the defendant, coapting, in the process, events far removed in time and place and relevance from the proper inquiry at hand. The very concept of a sentence should have *245 operated to preclude this misadventure. One does not receive a sentence for leading a less valuable life than someone else. One receives a sentence under our system for having committed a crime. Violating this principle, the prosecutor’s human worth comparison defies my colleagues’ justification just as it did the Payne decision.
B.
When one steps back and surveys American sentencing practice, the fact that the majority faces so hard a task in accommodating Payne to comparisons of human worth is not surprising.
The comparative worth argument relied on here fell within the category of factors that the Supreme Court has prohibited as unduly prejudicial in the death penalty sentencing context. See Johnson v. Mississippi 486 U.S. 578, 584-85, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (quoting Zant v. Stephens, 462 U.S. 862, 885, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)) (prohibiting death penalty decisions “predicated on mere ‘caprice’ or on ‘factors that are constitutionally impermissible or totally irrelevant to the sentencing process’ ”). The comparison of what Humphries and Smith happened to be doing in 1984 or 1986 or 1988 or at some fortuitous past point in their separate lives is the essence of an arbitrary and capricious circumstance. That Dickie Smith happened to be building houses while Shawn Paul Humphries happened to be breaking into houses is a judgment freighted with comparative moral import. It was not, however, a permissible basis under the Due Process Clause on which to condemn the defendant to death. Juries are free to mete out capital verdicts based on the evidence before them, the consequences of the crime for the victim’s family and loved ones, the presence or absence of a variety of aggravating or mitigating circumstances, or the sheer heinousness of the offense. See, e.g., South Carolina Code § 16-3-20(C). All of these factors are focused on individuals qua individuals and are not comparative in nature. But one thing the centerpiece of closing argument cannot invite is a sentence on the basis that one person is of more intrinsic value than someone else. A defendant may not be condemned simply for being deemed, over the long trajectory of life, a less estimable human being than his victim.
In the wake of Payne, the federal government, the military, and thirty-three of the thirty-eight states with the death penalty have authorized the use of victim impact evidence in capital sentencing. John H. Blume, Ten Years of Payne: Victim Impact Evidence in Capital Cases, 88 Cornell L.Rev. 257, 267 (2003). Unsurprisingly, while these jurisdictions allow a broad range of victim impact evidence, none sanctions the sort of comparative worth arguments advanced in this proceeding. To place the matter in perspective, the United States Sentencing Guidelines, made advisory after Booker, contemplate a multitude of enhancements and departures for a variety of factors relating to the crime. These include the knowing selection of a vulnerable victim, U.S.S.G. § 3A1.1, the perpetrator’s aggravating role in the offense, U.S.S.G. § 3B1.1, the abuse of a position of trust or use of a special skill in committing the offense, U.S.S.G. § 3B1.3, the infliction of significant physical or extreme psychological injury on the victim, U.S.S.G. § 5K.2, 5K2.3, the use of a weapon or dangerous instrumentality in the commission of the crime, U.S.S.G. § 5K2.6, and the crime’s purpose of facilitating or concealing another offense, U.S.S.G. § 5K2.9. One can look in vain among these enhancements and departures for any factor remotely resembling the relative worth *246 of the victim’s and defendant’s lives. Such a factor would hardly form the basis of a two-level increase, much less the imposition of a sentence of death.
If we ignore Payne’s condemnation of the use of comparative human worth arguments, we invite future abuses. As the trial judge exclaimed, this was “one of the best arguments I have ever heard in my life given in a closing argument ... in terms of the technique, ... delivery, effectiveness.” The argument was so effective, however, precisely because it was so improperly prejudicial to Humphries, and ignored the bedrock premise that “punishment should be directly related, to the personal culpability of the criminal defendant,” California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Connor, J., concurring).
My concurring brother seeks repeatedly to condemn the dissent’s discussion of sentencing principles without ever trying to rebut it. Indeed, the concurrence fails to come to grips with the fact that what transpired in this case was a profound departure from traditional American sentencing practice as it existed both before, during, and after the Payne decision. By breaking from sentencing regimes which relate punishment to the defendant’s actions, the majority also departs from the historic understanding that punishment is not a matter of status, but rather a function of the legal wrong a citizen has committed and his responsibility therefor. The majority allows this defendant to be executed, not for doing, but for being a less worthy person than someone else. Such a sentence strays so far from the normal ambit of a court of law as to strain human faculties. Measuring the relative value of human beings on whatever ineffable scale that applies could not be a more dangerous exercise. Thankfully, American sentencing practice has until now limited itself to the more manageable domain of crimes and their consequences.
III.
The application of the federal habeas statute here requires us to inquire whether the state court applied the governing legal rule “unreasonably to the facts of a particular prisoner’s case.” Williams v. Taylor, 529 U.S. 362, 407-08, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The federal law that governs Humphries’ claim of ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The majority devotes the lion’s share of its attention to whether the prosecutor’s comments respected Payne. Payne is of course central to this case. But it provides a rule of decision here only insofar as this record presents a glaring violation of its dictates, which the defense should have noticed and complained of forthwith. The failure to do so here was a constitutional wrong under the Sixth Amendment.
The standards in this area are well settled. Under Strickland, the defendant must first “show that counsel’s performance was deficient.” Id. at 687, 104 S.Ct. 2052. To establish this deficiency, the defendant must produce evidence that the “counsel’s representation fell below an objective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052. Second, the defendant must show that the deficient performance resulted in actual prejudice to his case. A showing of prejudice requires the defendant to prove that “counsel’s errors were so serious as to deprive the defendant of a fair trial.” Id. at 687, 104 S.Ct. 2052. In the context of a capital sentencing proceeding, the question is whether “there is a reasonable probability that, but for the counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052. *247 Prejudice is established in a' capital case where the jury is considering both aggravating and mitigating evidence during sentencing if “there is a reasonable probability that at least one juror would have struck a different balance,” but for the constitutional error. Wiggins v. Smith, 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Under Strickland, the failure of Humphries’ counsel to cry foul when the prosecutor compared the victim’s general value to that of the defendant clearly supports a Sixth Amendment violation.
I have already described the degree to which the prosecutor’s human worth comparisons flew in the face of existing federal law and established sentencing practice. I do recognize that state law on sentencing evidence is permissive. See State v. Gutledge, 326 S.C. 220, 487 S.E.2d 590, 594 (1997). But there are boundaries to be respected, and the prosecutorial comments here traveled well beyond them. Coming, as they did, at the close of proceedings, and nestled among several explicit requests to put his client to death, the comparative worth exhortations in these comments should have struck defense counsel instanter.
I realize that counsel’s decisions should not be picked apart by hindsight. Caution is particularly needed in collateral proceedings, when issues that appear plain to a habeas court have only become so after several rounds of anterior review. Advocates must often make instantaneous decisions with imperfect information and without the benefit of considered judgment. And, although correcting every error of counsel might yield some benefit, it would also create far more substantial costs going forward. In particular, second-guessing counsel’s decision not to object at closing argument would encourage a slew of vexatious challenges that would needlessly distract the court and jury. Worse still, such hindsight might discourage tactical choices to remain silent, prompting lawyers to off-putting interjections that would needlessly - imperil their client’s defense. Mindful of ill possibilities such as these, this circuit has always indulged a “strong presumption that counsel’s .conduct falls within the wide range of reasonable professional assistance.” Truesdale v. Moore, 142 F.3d 749, 753-54 (4th. Cir.1998).
That having been said, there are some occasions when counsel must object or lose all claim to his defined Sixth Amendment role as representative of the accused. I emphasize yet once more the unprecedented character of the prosecution’s closing argument and the extent of its departure from the most settled principles of American sentencing. For a lawyer to allow his client to be put to death on the basis of such an argument is to deprive the defendant of any semblance of effective assistance at the precise moment when he needed that assistance most.
Neither of Humphries’ two counsel objected to the State’s comparative worth arguments at trial. They did lodge a general challenge to the admissibility of victim impact evidence without prior notice, which they reserved for appeal. But they were remarkably silent during the comparative worth arguments, and admitted after trial that their failure to object constituted ineffective assistance of counsel. Their post-trial admission here must be taken as more than a mere tactic. While the concurrence contends that the failure of an objection was “objectively reasonable trial strategy,” Cone. Op. at 234, this is a creative reconstruction of counsels’ thought processes that neither the majority, nor the South Carolina Supreme Court, nor the State, nor counsel itself has ever sought to advance. The failure to object was, in counsel’s words, “not a matter of *248 trial strategy or tactics,” J.A. at 219, but of simply dropping the ball. The State’s argument, which was at once without precedent and at odds with traditional precepts of due process, called for Humphries’ counsel to exercise those skills which had led to their appointment.
There is also no doubt that this record presents a “reasonable probability that at least one juror would have struck a different balance,” but for the constitutional error. Wiggins, 539 U.S. at 537, 123 S.Ct. 2527. The trial judge recognized as much when he profusely complimented the prosecutor’s close. Counsel’s failure to object to the prosecutor’s comments therefore prejudiced Humphries under the second prong of Strickland. Comments of this sort represent the types of appeal to jurors whose potential for prejudice the Supreme Court has long condemned in the death penalty context. Sec Eddings v. Oklahoma, 455 U.S. 104, 118, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (O’Connor, J., concurring); Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion). Coming, as it did, just before the jury began its deliberations, the emotionally charged human worth comparison made by the prosecutor could only have caused Humphries improper prejudice.
The majority attempts to deny this conclusion by maintaining that these comments were quantitatively and qualitatively unimportant in the totality of the prosecutor’s closing. But this argument is flawed on at least two grounds. First, it is simplistic. The offensive portions of the prosecutor’s final presentation may well take up “less than four pages of [the] approximately twenty-eight” that it occupies in full. Maj. Op. at 221. But we would be automata, not judges, if we undertook inquiries of the sort mandated by the second prong of Strickland with the kind of approach the majority’s computation represents. Indeed, the product of those inquiries would be reduced to arbitrariness were we to dilute the judicial enterprise in such a manner.
Second, my colleagues’ position fails to appreciate the effective qualities of the oratory in which the human worth comparison occurred. Contrary to the claim that the “solicitor’s comparison of the lives of both Humphries and Dickie Smith” was not “the centerpiece of the solicitor’s argument,” Maj. Op. at 220, this comparison was in fact the piece-de-resistance of the prosecutor’s presentation to the jury. One simply cannot review the argument without seeing that it builds inexorably towards this apex. The devices the prosecutor employs while making the comparison — dramatic repetition of the words “[t]hat’s the same year,” punctuation of a plea to the jury with the phrase “how profane,” the plaintive repetition of “if not” in his ultimate exhortation, and the series of rhetorical questions — all stand in stark contrast to the prosaic remainder of the record. Appreciation of an argument’s dynamic compels the conclusion that the solicitor’s human worth comparison was intended to be, and was, a climac-tical flourish designed to move the jury to a sentence of death.
I respect fully the prerogative of lawyers to make an emotional close. The prosecutor’s position as advocate must also afford him wide latitude of tactic. But the objective must at times extend beyond securing the State’s wishes at any cost. To a juror unschooled in the ways of the law, the solicitor’s human worth comparison may have appeared a legitimate legal appeal, not the departure from historic sentencing procedure that it was. Thus assured that the State’s invidious invitation was permitted, at least one juror may well have consciously engaged what would oth *249 erwise have remained only faintly implicit in the evidence. Under Wiggins, this possibility satisfies the prejudice prong of Strickland and supports resentencing.
IV.
Capital procedure in our system must remain largely the province of the states. And victim impact has many good and legitimate uses, among them awakening juries to the tragic toll of serious crime. But the comparison here was an abuse of this powerful prosecutorial tool, an abuse that no reasonable attorney would sit and greet with silence. To argue that a defendant should be sent to death because his life was of less intrinsic value than his victim is to ask a jury to decide, not on the character of the crime, not on the consequences of the crime, not on the criminal record of the perpetrator of the crime, but on some unfettered evaluation of human worth that works improper prejudice.
Victim impact evidence may play an especially important part in capital proceedings where the crime has caused almost unfathomable pain. But no state sentencing practice nor precept of federal law should be read to permit a capital sentence to be based on a comparison-of the relative value of human life or worth of human beings. Human worth comparisons are the hallmarks of totalitarian governments. They do not belong in our country. Societies have gotten into the deepest sort of trouble by making these comparisons an explicit basis for the imposition of death. The most terrifying regimes of the Twentieth Century were those in which governments weighted the value of the lives of their citizens as a prelude to executing them.
I realize that the transgression before us today does not even approach the most terrible examples of human expendability. I appreciate that the sentence Humphries challenges was preceded by an adjudication of guilt. And I am well aware that a variety of safeguards in federal and state law work to protect the legitimacy of such convictions.
But to say that Humphries was properly found guilty is one thing and to say that he can properly be executed is quite another, when his sentence is based on the kind of extraordinary arguments that the prosecutor’s presentation represents. To accept this sentence is to set foot on a road Americans will not recognize and our Constitution will not tolerate. ■ With great respect for my friends in the majority, I would not take a single step along this path.
Judge MICHAEL, Judge GREGORY, and Judge DUNCAN join me in this dissent.

 My views have not changed in any respect from those I expressed in the vacated panel opinion, Humphries v. Ozmint, 366 F.3d 266 (4th Cir.2004). This dissent relies upon that opinion as supplemented by points debated during the process of en banc rehearing.